ASSOCIATED HOSPITAL SERVICE OF MAINE
*vs.*
GEORGE F. MAHONEY AND THE HEALTH INSURANCE
ASSOCIATION OF AMERICA, ET AL., INTERVENORS

Cumberland.   Opinion, October 13, 1965.

*Verrill, Dana, Walker, Philbrick & Whitehouse,*
  by *John A. Mitchell,* for Plaintiff.

*Frank E. Hancock, Attorney General,*
*Albert E. Guy and*
*Leon V. Walker, Asst. Attys. Gen.,* for Defendant.

*Bernstein, Shur,. Sawyer & Nelson,*
  by *Sumner T. Bernstein, and*
    *Kenneth Laurence,* for Defendant.

SITTING: WEBBER, TAPLEY, MARDEN, RUDMAN, JJ. WILLIAMSON, C. J., did not sit. SULLIVAN, J., sat at argument but retired before the opinion was adopted.

MARDEN, J. On report. Associated Hospital Service of Maine (AHS) was incorporated by Chapter 24, Private and Special Laws, 1939 (Charter), for the purpose of establishing, maintaining and operating a nonprofit hospital service plan whereby hospital care might be provided by hospitals with which the corporation might have a contract to such of the public as might become subscribers under a contract with AHS.[1] The act provided that it could qualify for operation by submitting, among other things, copies of its proposed contracts and table of rates to be charged to the Insurance Commissioner (Commissioner) of the State and that the Commissioner should annually issue a license to AHS upon being satisfied, among other things, that the proposed program be a non-profit

---

[1] *Blue-Cross Contract.* The contract between a participating hospital and AHS, provides that *inter alia*, upon the financial responsibility of AHS The Hospital will supply any member "with the allowances to which he is entitled" by virtue of the member's contract with AHS "and from THE HOSPITAL'S prevailing rates of charge * * * during the days of care authorized by AHS to grant an allowance to the patient to the full extent provided for" in the contract between the patient and AHS. The patient is responsible directly to the hospital for payment of any charges remaining after allowance by the hospital of the amount obligated by AHS.

Associated Hospital Service agrees "(t)o pay THE HOSPITAL for making the contractual allowances * * * which have been provided to the member,"—a stated fee for admission of the member-patient and subsequent per diem rate. Such payments "may be supplemented from time to time as permitted by the resources of AHS," which payments result in a "non-profit" operation.

The contract between AHS and its member, said contract being called a certificate, provides that the benefits under the Member-AHS contract "shall be in the form of allowances by Participating Hospitals against the regular charges for services rendered by such Participating Hospitals, except as otherwise * * * provided for in this Certificate." It is provided that the subscriber (member) "shall be primarily responsible to such hospital for * * * charges not included in the benefits of this Contract * * *."

The benefits provided by the member's contract with AHS do not include services of attending physician, services not regularly available in the participating hospital, private nurses, blood and blood plasma, ambulance service, appliances and supplies taken from the hospital upon discharge and certain other care and services not here pertinent.

program and that the rates charged and benefits provided be fair and reasonable. The Commissioner was authorized to examine the affairs of the corporation; was to serve as an arbiter in controversies arising between the corporation and any hospital, and was empowered to supervise dissolution as in cases involving insurance companies. The act declared AHS a charitable institution and exempted it from taxation. This service of the corporation has become known as "Blue Cross" service. This special act was approved March 2, 1939.

> At the same session of the Legislature Chapter 149, Public Laws 1939, an enabling act, with essential terms the same as Chapter 24 of the Private and Special Laws, permitted the organization of non-profit hospital service corporations under the general law. The supervisory responsibility of the Commissioner was expanded to the licensing of selling agents for the corporation. This general act was approved March 30, 1939.

By Chapter 21, Private and Special Laws 1943, permissible operation of AHS was extended to cover contracts for medical and surgical service.[2] This service of the corporation has become known as "Blue Shield" service.

---

[2] *Blue-Shield Contract.* In the contract between a participating physician and AHS, the physician agrees to render professional services in accordance with the plan of AHS and that he will accept payment therefor according to the schedule of fees fixed by AHS with provisions for supplemental payments from earnings upon AHS investments.

In the contract between the member and AHS for physician's service benefits, AHS certifies that the subscriber is "entitled to benefits in accordance with the terms, conditions and provisions appearing hereinafter," followed by schedule of benefits, provided, however, that "A.H.S. shall not be responsible for payment of any difference between such amounts (of benefits) and the doctor's fee for his services, such difference being the personal responsibility of the * * * Member." The patient is also responsible to the doctor for payment of charges for services rendered during extra visits, except such charges paid under the contract for intensive care.

This contract provides, within stated limits, the benefits of an attending physician excluded under the Blue Cross contract (footnote 1).

By Chapter 47, Public Laws 1951, the permissible operation of non-profit hospital service corporations was likewise extended under the general law.

By Chapter 175, Private and Special Laws 1955, the permissible operation of AHS was extended to group contracts and reciprocal arrangements with similar corporations in other states.

The general law was not co-extended.

By Chapter 47, Private and Special Laws 1957, the authority of AHS was extended to issue non-profit contracts under which it assumed liability (responding by cash indemnity) on the whole or part of the expenses incurred by a subscriber as a result of injury or disease not covered by the corporation's regular contracts for hospital or medical service (hereinafter referred to as "extended benefits") provided, however, that such liability was reinsured and further, that, subject to the prior approval of the Commissioner, AHS might, on a non-profit basis, perform services for the State or United States Governments. The phase of the 1957 extension authorizing extended benefits not covered by AHS's regular contracts is in Section 3 C of the plaintiff's charter and is the source of the present controversy.

The general law was not co-extended.

By Chapter 135, Private and Special Laws 1963, Charter, Section 3 C was amended to authorize AHS to offer the extended benefits without reinsurance, provided that a deposit was made with the Treasurer of State as security for the payment of "said additional benefits," which shall be limited to health care services and supplies, but not include indemnity for loss of time, incapacity or death.[3]

---

[3] *Extended Benefits Endorsement.* This contract between the member and AHS provides that "in consideration of the additional charges for this Endorsement, the following extended benefits are

At this point, and after AHS had deposited the required security, it submitted to the Commissioner a copy of the proposed extended benefits contract (Extended Benefits Endorsement BC-BS-63) and offered the new contract to the public.

After some intervening negotiations, and an opinion rendered to the Commissioner by the office of the Attorney General, the Commissioner disapproved the proposed contract as being in conflict with R. S., 1954, Chapter 60, §§ 244-257, inclusive, "Non-profit Hospital or Medical Service Organizations" (now 24 M.R.S.A., §§ 2301-2315), which statute embodied the 1939 and 1951 public laws referred to above, with changes not here pertinent.

The conflict arises between Section 3 C of the AHS charter which authorizes the extended benefits contract and §§ 244 and 246, of Chapter 60, R. S., 1954 (now 24 M.R.S.A., §§ 2301 and 2303) which defines the scope of such organizations under the general law and which scope is confined to the Blue Cross and Blue Shield programs.

Associated Hospital Service sought a declaratory judgment as to the Commissioner's authority to so disapprove and as to the validity of Section 3 C of its charter, and sought an injunction *pendente lite* against interference by the Attorney General and the Commissioner. While the complaint was pending before the single justice, the Health Insurance Association of America, *et al.*, sought permission to intervene under Rule 24 M.R.C.P. and were per-

---

added to those of the applicable basic certificates," (Blue Cross-Blue Shield certificates). For this consideration AHS contracts that "the benefits of this Endorsement will be paid as indemnities for Eligible Expenses incurred by the Subscriber" for expenses incurred as a result of injury or disease not covered by the basic certificates, with AHS reserving the right to make payment either to the subscriber or the provider of services. These extended benefits include, among other things, for care in a skilled nursing facility, private nursing, visiting nurse service, ambulance service, appliances and supplies needed after discharge, all with fixed maximum monetary limits.

mitted to do so. The complaint was discontinued as against the Attorney General. After hearing, introduction of exhibits and recording of stipulations, preliminary injunction was granted and by agreement the case was reported.

The following questions of law are stipulated:

1. The extent of the Insurance Commissioner's jurisdiction over issue of contracts by plaintiff.

2. Whether Chapter 135, Private and Special Laws 1963 (and Chapter 47, Private and Special Laws 1957), conflicts with Chapter 60, § 244, R. S., 1954, as amended (and if so with what effect), and

3. Whether (exercise of rights granted plaintiff under) Chapter 135, Private and Special Laws, 1963, denies the intervenors the equal protection of the law (constitutionally guaranteed).

Within the stipulated questions plaintiff contends:

1. That the Insurance Commissioner has no standing to question the constitutionality of Charter, Section 3 C, and

2. That the intervenors have no standing to question the constitutionality of Charter, Section 3 C.

Although not stipulated, it is established that AHS is the only non-profit hospital or medical service organization existing in Maine.

### Standing of Commissioner and Intervenors.

The standing of the Insurance Commissioner and the intervenors is first considered.

Conceding that the weight of authority does not permit a ministerial public officer to challenge the constitutional validity of the law under which he is enjoined to act

through a writ of mandamus, *State ex rel. Atlantic Coast Line R. Co.* v. *State Board of Equalizers*, 94 So. 681, 689 (Fla. 1922) ; *Smyth* v. *Titcomb*, 31 Me. 272, 285, but with cases *contra* as in *Van Horn, et al.* v. *State ex rel. Abbott*, 64 N. W. 365, 372 (Neb. 1895), we are here involved neither with mandamus nor the ministerial act of a public officer. We are here concerned with a petition for declaratory judgment in which we are asked to review the legal position assumed by the Commissioner.

The very nature of this proceeding requires examination of all pertinent issues. 14 M.R.S.A., §§ 5953, and 5954.

The conduct of the Commissioner, here reviewed, is not ministerial. The Commissioner is not a party to the case by virtue only of the duty imposed upon him by Section 6 of the plaintiff's charter to annually issue a license to it upon being satisfied of the existence of uncontroversial facts. His decision as to license requires a finding as to controversial facts and involves exercise of discretionary power and judgment, and such act is quasi judicial.

> "A purely ministerial duty is one as to which nothing is left to discretion. Judicial acts involve the exercise of discretionary power or judgment. Judicial acts are not confined to the jurisdiction of judges." *City of Biddeford* v. *Yates*, 104 Me. 506, 511, 72 A. 335.

He is raising an issue as a public officer by virtue of what he considers a conflict between the private and public laws pertaining to an activity, both the private and public aspects of which are within his responsibility.

The operation by the plaintiff is not only sufficiently analogous to that of the insurance industry, which is a matter of public interest, *American Fidelity Co.* v. *Mahoney*, 157 Me. 507, 514, 520, 174 A. (2nd) 446, to be likewise of public concern, but the legislature has so recognized it by the terms of plaintiff's charter.

Analogically in cases where insurance companies disagree with the Commissioner's disapproval of a proposed contract, the statute provides an appeal to the court and that the court "shall determine whether or not the reasons assigned by the commissioner are valid and thereupon sustain or annul said ruling." 24 M.R.S.A., § 56. It is the failure of the Commissioner to approve the proposed "extended benefits" contract offered by plaintiff that prompts this litigation.

Even within the general rule preventing a ministerial officer from questioning the constitutionality of the law under which his performance is sought there is recognized an exception "when the rights of the state or the public interest are involved." *Port Authority of City of Saint Paul, et al.* v. *Fisher,* 132 N. W. (2nd) 183, [10] 194 (Minn. 1964) ; *Department of State Highways, et al.* v. *Baker,* 290 N. W. 257, [2] 260 (N. D. 1940) ; and *Loew* v. *Hagerle Bros., et al.,* 33 N. W. (2nd) 598, [1] 601 (Minn. 1948).

Within the same rule an exception is recognized when the performance by an officer in compliance with an invalid law may injuriously affect him personally, such as exposing him to a breach of his official bond, *City of Montpelier* v. *Gates, et al.,* 170 A. 473, [17, 18] 476 (Vt. 1934) ; and *State ex rel. Sullivan* v. *Boos,* 126 N. W. (2nd) 579, 582 (Wis. 1964), or when an officer acts under advice of the State's Attorney General. *Baker, supra; State ex rel. Equality Sav. & Bldg. Ass'n* v. *Brown,* 68 S. W. (2nd) 55, [1, 2] 58 (Mo. 1934) ; and followed in *State Board of Mediation* v. *Pigg,* 244 S. W. (2nd) 75, [1-4] 78 (Mo. 1951). The defendant Commissioner is bonded. 5 M.R.S.A., § 9.

Furthermore the question of constitutionality, as it affects the Commissioner, enters the case collaterally. Neither the plaintiff's charter nor the public law under consideration *per se* raises a constitutional question between AHS and the Commissioner. Constitutionality is

injected into the dispute by Article IV, Part Third, Section 14 of our Constitution, quoted later in this opinion.

The Commissioner is competent to question the compatibility of the plaintiff's charter and the general law.

The intervenors, allegedly representing a wide segment of the health insurance industry active in Maine, asked, and were permitted to join the case under Rule 24, M.R.C.P., as having interests which would be affected by the extended benefits contract which plaintiff proposes to sell. It cannot be contended seriously that if the plaintiff, as an organization, tax exempt and relatively free from statutory supervision, is permitted to issue contracts to indemnify the subscribers for expenses of health care service and supplies not identified with the hospital and medical service contracts, in competition with the health insurance contracts offered by the intervenors subject to taxation and statutory supervision, that such business cannot and may not injuriously affect them. "One who would strike down a statute as unconstitutional, must show that it affects him injuriously, and actually deprives him of a constitutional right," *Inhabitants of Town of Canton* v. *Livermore Falls Trust Company*, 136 Me. 103, 107, 3 A. (2nd) 429; and *State of Maine* v. *The Fantastic Fair, et al.*, 158 Me. 450, 472, 186 A. (2nd) 352, or threatens to do so, *Sleeper, Applt.*, 147 Me. 302, 308, 87 A. (2nd) 115 and *Bryan* v. *The Federal Open Market Committee, et al.*, 235 F. Supp. 877, [2] 880 (D. C. Mont. 1964). As between AHS and the intervenors the "equal protection" clause of the Constitution has direct application. The intervenors are competent to raise this constitutional question.

With "standing" determined, we are called upon to consider the legal interests of three "parties."

### Commissioner's Supervisory Power.

While it is nowhere made explicit that the "service" sold by plaintiff under its special charter, and authorized for

sale by non-profit hospital service corporations under the general law, is "insurance,"[4] both plaintiff's charter and the general law grant the Commissioner supervisory powers as previously noted, — not because the service is insurance, but because the commissioner's office was considered a proper place for the responsibility to rest. Among these powers is the granting of the original and renewal licenses (Charter, Section 6, and 24 M.R.S.A., §§ 2301, 2304, and 371) qualification for which requires, *inter alia,* submission to and approval by the Commissioner of copies of the proposed contracts. The charter, Section 6 provides that the Commissioner "shall annually issue a * * * license upon being satisfied * * * (b) that the rates charged and benefits to be provided are fair and reasonable * * * ." The Public Law, 24 M.R.S.A., § 2305, provides that:

> "The commissioner shall issue a license on payment of a fee as provided in (24 M.R.S.A.) section 371, subsection 3, if the applicant meets the following requirements:
>
> * * * * * * * * *
>
> "2. **Contracts.** The contracts * * * obligate each participating party to render service to which each subscriber may be entitled under the terms of the contract issued to the subscribers."

* * * * * * * * *

24 M.R.S.A., § 371, prescribes the fee "for issuing or renewing a license to a nonprofit hospital or medical service organization under section 2305 * * * ."

It is explicit that the license of plaintiff is renewable annually. It is implicit in public law, 24 M.R.S.A., §§ 371 and 2305, that licenses are issued annually.

For the Commissioner to determine annually that "benefits to be provided" by plaintiff and that contracts under

---

[4] See 29 Am. Jur., Insurance, § 12, and cases pro and contra in Annot. 167 A.L.R. 322 *et seq.*

the general law "obligate each participating party, etc.," copies of proposed contracts must be submitted.

Charter Section 10 and public laws § 2306 require annual reports, authorize the Commissioner to prescribe the form and content thereof, by which he may demand disclosure of existing and proposed contracts.

Both charter Section 11 and public laws § 2307 in substantially identical language give the Commissioner investigatory powers into the affairs of the corporation. By this authority he may secure disclosure of existing and proposed contracts.

Additionally, § 2314 of the general law empowers Commissioner to revoke a license for cause.

Disclosing at this point that we conclude, post, that the public law governs, it is here held that the Commissioner through his power to license and revoke based upon the criteria expressed in the statute has supervision of the contracts of non-profit and medical service organizations.

*Question of Conflict Between Charter and Statute.*

The question of conflict between the Charter and the Statute is based upon the terms of Section 3 C of the Charter and 24 M.R.S.A., § 2303. Both the Charter and the Statute authorize the operation of the "Blue Cross-Blue Shield" programs. Sec. 3 C of the charter authorizes the extended benefits — the issuance of contracts under which plaintiff "assumes liability on the whole or part of expenses incurred by a subscriber as a result of injury or disease not covered by this corporation's regular contracts for hospital service or medical service * * * which shall be limited to health care services and supplies and shall not extend to and include indemnity for loss of time, incapacity or death benefits."

These "extended benefits" are not authorized under the general law.

The Commissioner and intervenors urge that this difference calls for the application of Article IV, Part Third, Section 14, Constitution of Maine:

"Corporations shall be formed under general laws, and shall not be created by special Acts of the Legislature, except for municipal purposes, and in cases where the objects of the corporation cannot otherwise be attained; and, however formed, they shall forever be subject to the general laws of the State";

that the Constitution so applied requires plaintiff to be limited to the general law (24 M.R.S.A., § 2301, *et seq.*) and that its Extended Benefits Endorsement is invalid.

Plaintiff counters that the silence of § 2303 on the matter of benefits to be extended beyond the hospital and medical service explicitly authorized is not a prohibition, that there is no conflict, that the presumption of *Laughlin* v. *City of Portland*, 111 Me. 486, 90 A. 318 (1914) that the Charter is constitutional (does not conflict) is unrebutted, and that if the Charter or the Statute is susceptible of two interpretations, the one sustaining constitutionality (nonconflict) should be adopted. *Stubbs, Applt.*, 141 Me. 143, 39 A. (2nd) 853 (1944). We recognize the presumption.

It must be noted that the special law granting plaintiff's Charter was approved March 2, 1939. The public law authorizing Non-profit Hospital Service Corporations was approved March 30, 1939. "It is this approval which gives life to all legislative enactments," Opinion of the Justices, 120 Me. 566, 569.

Section 1 of Chapter 149, Public Laws 1939, reads:

"Any corporation organized under special act of the legislature, or under the provisions of chapter

> 70 of the revised statutes (the then general law authorizing formation of corporations without capital stock) for the purpose of * * * operating a nonprofit hospital service plan * * * may be licensed by the insurance commissioner on the terms and conditions hereinafter provided."

Our present statute, 24 M.R.S.A., § 2301 (Non-profit Hospital or Medical Service Organizations), reads in pertinent details the same, — the then Chapter 70 (referred to above) R. S., 1930, now being Title 13, M.R.S.A., § 901.

The Public Law of 1939, approved March 30, 1939 specifically included within its terms the corporation organized 28 days earlier under the special act. In substance Chapter 24, Private and Special Laws 1939, was merged into and enveloped by Chapter 149, Public Laws 1939. Such legislative action was only consistent with Article IV, Part Third, Section 13 of the Maine Constitution which states:

> "The legislature shall, from time to time, provide, as far as practicable, by general laws, for all matters usually appertaining to special or private legislation."

The rationale of this constitutional mandate is quoted from the legislative record in Opinion of the Justices, 146 Me. 316, 322, 80 A. (2nd) 866, and fully applies here.

Plaintiff's present Charter and Public Law 24 M.R.S.A., § 2301, *et seq.* are in conflict as to the "extended benefits" phase of our question.

A corporation formed under the authority of the general law (24 M.R.S.A., § 2301) would be confined in its declaration of purpose to the scope therein allowed. The declaration of purpose would be its charter and the specific powers enumerated in its charter "excludes all others except such as are reasonable and necessary to carry into effect those expressly given." *Gardiner Trust Company* v. *Augusta*

*Trust Co.*, 134 Me. 191, 198. The silence of 24 M.R.S.A., § 2303 on the subject of "extended benefits" cannot be authority for their issue without restriction. The authority of such a corporation to issue "extended benefits" contracts, would depend upon their reasonability and necessity in carrying into effect the hospital and medical service contracts. The Blue Cross and Blue Shield programs have been operated successfully without the proposed extension. The additional benefit contracts are neither reasonable nor necessary for carrying the Blue Cross-Blue Shield services into effect.

Under Section 14 of our Constitution quoted *supra,* the public law prevails.

This conflict between plaintiff's charter and the general law and the determination that as to Blue Cross-Blue Shield activities the public law prevails, does not, however, fully solve our problem.

Granting that the Blue Cross-Blue Shield services authorized by the special law are identical to those authorized by the public law and that the public law controls by virtue of the clause of the Maine Constitution cited, it might be urged that one phrase of the constitutional provision has been overlooked. This phrase reads that "in cases where the objects of the corporation cannot otherwise be attained" such corporation may be created by special act. Were it determined that the objects (extended benefits) [5] of AHS could not otherwise be attained, special legislation would be constitutionally allowable and arguendo power to establish must include power to extend. Upon this premise the extended benefits phase of plaintiff's operation could be valid as a special grant from the legislature.

Were it determined that the objects (extended benefits) [5] of AHS could be attained under the general law 13

---

[5] Sale of extended benefits contracts by a tax exempt and relatively supervision free organization.

M.R.S.A., §§ 901-936 (corporation without capital stock), 13 M.R.S.A., §§ 71 *et seq.* (stock corporation) or 24 M.R.S.A., § 502 *et seq.* (stock and mutual insurance companies) plaintiff's operation could not be valid as a special grant from the legislature.

We have neither to apply the "attainment" test nor decide the result of its application for if the extended benefits contract under the operation here proposed be authorized by either special or public law, it only brings us face to face with the ultimate question raised by the intervenors.

The answer to this question is found by a determination of the nature of the contract offering the extended benefits.

### Nature of Challenged Contract.

Footnotes, *supra,* record certain charges and list certain suppliers of services excluded under the Blue Cross-Blue Shield plans (footnotes 1 and 2) and record certain charges and list certain suppliers of services included under the Extended Benefits Endorsement (footnote 3). It is demonstrated that the indemnity supplied by the Endorsement covers charges of and services supplied by non-participants in the basic Blue Cross and Blue Shield contracts as well as extending by cash indemnity certain of the "basic" benefits, — and unrelated to the presence of surplus funds after the discharge of AHS obligation under the Blue Cross and Blue Shield contracts.

Is this Extended Benefits Endorsement a contract of insurance?

> "The authorities are substantially agreed that insurance may be defined as an agreement by which one person for a consideration promises to pay money or its equivalent, * * * to another on the destruction, death, loss, or injury of someone or something by specified perils." 29 Am. Jur., Insurance § 3.

Our 24 M.R.S.A., § 1, defines a contract of insurance as:

" * * * an agreement by which one party for a consideration promises to pay money or its equivalent or to do some act of value to the assured upon the destruction or injury of something in which the other party has an interest."

In simpler terms the court in *Re Hilpert,* 300 N. Y. S. 886 (1937), defined insurance as:

"A simple contract whereby the insurer in return for a stated consideration agreed, upon the happening of a specified event, to pay the insured a fixed or ascertainable sum of money."

A reiterative definition, also in simple terms is given in *Epmeier* v. *United States,* 199 F. (2nd) 508, [1] 509 (7 CCA 1952) where the court said:

"Insurance, * * * involves a contract, whereby, for an adequate consideration, one party undertakes to indemnify another against loss arising from certain specified contingencies or perils. Fundamentally and shortly, it is contractual security against possible anticipated loss. Risk is essential and, equally so, a shifting of its incidence from one to another."

Although it might be contended, that such definitions encompass the Blue Cross-Blue Shield plans as well as the extended benefits, the intervenors state that they challenge only the extended benefits phase of plaintiff's operation and we confine our consideration to that point. Plaintiff, in discussing its operations, assiduously refrains from speaking of its programs in insurance terms (membership or subscriber's fees, rather than premiums; service or benefits rather than insurance, operational cost, rather than underwriting expenses), but the program is properly to be categorized, not by what it is called, but by what it in fact does. 29 Am. Jur., Insurance § 5.

Plaintiff's contract for extended benefits falls within the definition of insurance. Associated Hospital Service "in consideration of the additional charges for this Endorsement" obligates itself to pay in dollars to either the subscriber or the "provider of service," as it may elect, as indemnities for eligible expenses, stated amounts, and within stated limits. The Extended Benefits contract is one whereby AHS in return for a charge (premium) agrees that not only where the subscriber's hospital and medical expenses, in stated categories, exceeds the charges covered by the basic Blue Cross-Blue Shield Plan, but where expenses are incurred with other than the participants in the basic contracts and for which the subscriber is directly responsible, AHS will indemnify him in dollars for stated expenses and within stated limits. The risk of the subscriber's (assured's) being exposed to certain expenses in excess and independent of the basic coverage is assumed by plaintiff, — shifted from the subscriber to AHS. The payments so promised are not contingent upon the existence of adequate surplus in AHS funds after the payment of the "basic charges." Associated Hospital Service had to "reinsure" under the 1957 special law[6] and deposit security under the 1963 special law. The "reinsurance" phase and the security deposit reflects legislative thinking that the extended benefits phase of plaintiff's operation is insurance. Neither the participating hospitals nor participating doctors assume these risks against which the subscriber is so protected. There is no discernable difference between this contract and the conventional health and accident insurance contract. The title "Extended Benefit Endorsement" does not change the nature of the obligation. It may properly be classified as insurance and as to this phase of plaintiff's operation it is engaged in the same

---

[6] "Re-insurance": an insurance by another insurer of all or a part of a risk previously assumed by the direct-writing company. Webster's Third New International Dictionary (unabridged) 1961.

business as the intervenors, — which brings us to the constitutional question raised by them.

*Intervenor's constitutional complaint.*

Intervenor's urge that legislative permission for plaintiff to sell this insurance as a charitable tax exempt corporation with relative freedom from statutory supervision while intervenors may sell the same protection only as a noncharitable taxable corporation subject to statutory supervision denies them equal protection of the laws under both the Fourteenth Amendment to the Federal Constitution and Article I, Section 6-A of our State Constitution.

> "The phrase 'equal protection of the laws' has not been precisely defined. In fact, the phrase is not susceptible of exact delimitation, nor can the boundaries of the protection afforded thereby be automatically or rigidly fixed. In other words, no rule as to what may be regarded as a denial of the equal protection of the laws which will cover every case can be formulated, * * *  * * * (E)ach case must be decided as it arises." 16 Am. Jur., (2nd) Constitutional Law § 486.

Unquestionably the legislature is empowered to establish regulations of a business in which the interest of the public is involved.

> "The general rule that legislation which affects alike all persons pursuing the same business under the same conditions is not such class legislation as is prohibited by constitutional provisions is subject to limitation to the extent that it does not permit discriminations by which persons engaged in the same business are subjected to different restrictions or are held entitled to different privileges under the same conditions." 16 Am. Jur., Constitutional Law § 518.

> "The discriminations which are open to objection are those where persons engaged in the same busi-

ness are subject to different restrictions, or are held entitled to different privileges under the same conditions. It is only then that the discrimination can be said to impair that equal right which all can claim in the enforcement of the laws." *Soon Hing* v. *Crowley,* 113 U. S., 703, 709 (1884), as quoted and followed in *Dirken* v. *Great Northern Paper Company,* 110 Me. 374, 386, 86 A. 320.

" \* \* \* (D)iscrimination, to be constitutional, must be based upon some reasonable ground, — some difference which bears a just and proper relation to the attempted classification, and is not a mere arbitrary selection. \* \* \* It must be reasonable and based upon real differences in the situation, condition or tendencies of things." *State* v. *Leavitt,* 105 Me. 76, 84, 72 A. 875.

The problem is one of classification.

Consistently with the realization that each case must be decided upon its merits, a multivariety of decisions pro and con exist in the federal court system, citation of which will serve no purpose.

The same varieties of interpretation to a lesser degree are found within our own decisions. Illustrative are the cases of *State of Maine* v. *King,* 135 Me. 5, 188 A. 775 (1936) and *In Re Milo Water Company,* 128 Me. 531, 149 A. 299 (1930). In *King* at pages 17-18, classification by the legislature was expressed as valid "if any state of facts reasonably can be conceived to sustain it" and that such classification is not reviewable unless "palpably arbitrary." In *Milo* the court expressed the principle less rigorously and said at page 537:

"The characteristics which can serve as a basis of a valid classification must be such as to show an inherent difference in the subjects placed in separate classes which peculiarly requires and necessitates different or exclusive legislation with re-

spect to them. * * * (T)here must be some natural and substantial difference germaine to the subject and purposes of the legislation between those within the class included and those whom it leaves untouched."

Other Maine decisions expressing the *Milo* rationale are *Boothby, et al.* v. *City of Westbrook, et al.,* 138 Me. 117, 23 A. (2nd) 316 (1941); *State* v. *Mitchell,* 97 Me. 66, 53 A. 887 (1902); *State of Maine* v. *Latham,* 115 Me. 176, 98 A. 578 (1916); and *State of Maine* v. *Old Tavern Farm, Inc.,* 133 Me. 468, 180 A. 473 (1935). While *King* post dates *Milo, Boothby* post dates *King* and is our most recent reiteration of the principle.

In *Mitchell* at page 71 the court observes, pertinently to our present situation, that "(i)f there be no real difference between the localities, or business, or occupation, or property, the State cannot make one in order to favor some persons over others."

Conceding the integrity of the cases cited, plaintiff urges that there are real, inherent and substantial differences between the operation of the plaintiff and that of the intervenors and that these differences bear a just and proper relation to their respective classifications and, conversely, that the differences are not unreasonable, capricious or arbitrary.

The differences which plaintiff advances in justification of plaintiff's status are, briefly stated, as follows:

(1) A much higher percentage of the subscriber's dollar is applied to its corporate purpose for the public benefit by way of hospital maintenance.

(2) That surplus funds are distributed periodically to the member hospitals hence making plaintiff's activity a non-profit operation.

(3) In the event of dissolution, assets would be distributed to participating hospitals, not as dividends to subscribers.

(4) Plaintiff assumes no risk, the same being borne by the participating hospitals and physicians, and

(5) That the extended benefits phase of plaintiff's activity is only incidental to the plaintiff's business.

As indicated above we do not share plaintiff's view as to assumption of risk. The contention may be valid as to the Blue Cross-Blue Shield contracts, but it is not valid as to the Extended Benefits Endorsement.

The fact, if it be a fact, that the present involvement in the Extended Benefits Endorsement is only incidental to the Blue Cross-Blue Shield plan, is not controlling. As stated earlier in the opinion, the threat to intervenors is not what has happened or is now happening, but what the law permits to happen. *Sleeper, supra.* The extended benefits contract has been offered only since 1963, and subject to challenge from the start, so that the alleged "incidentality" on that phase of the operation is no criterion.

Contentions 2 and 3 that surplus, if any, and assets upon dissolution inure to the public good by way of health service support are only attributes of a charitable organization, which this corporation is, — by legislative fiat rather than by its nature. See *United Hospitals Service Ass'n* v. *Fulton County, et al.*, 114 S. E. (2nd) 524 (Ga. 1960). Its ostensibly charitable character does not, under the circumstances, free it from constitutional criticism.

The percentage of the subscriber's dollar supporting the health service as against the percentage of the assured's dollar in the commercial insurance field may well be persuasive with the legislature, but do not control our present consideration.

The tax free and relatively unsupervised competition which plaintiff purports to supply in the health and accident insurance field is inconsistent with our system of free enterprise, violates the principles established in Maine judicature and results in unequal protection of the laws.

In answer to the stipulated questions of law it is held:

(1)    That through the licensing and revocation power expressly granted in the public law, the Insurance Commissioner has control over the issue of contracts by the plaintiff within the limits expressed in the public law.

(2)    That plaintiff's charter as it relates to Extended Benefits Endorsement, conflicts with the public law.

But this conflict is not here controlling.

(3)    That plaintiff's charter (as it pertains to issue of the "Extended Benefits Endorsement BC-BS-63" contract), denies the intervenors equal protection of the laws, and is hereby declared invalid.

(4)    That the injunction *pendente lite* is discharged, and

(5)    That the deposit made by plaintiff with the Treasurer of State in accordance with Escrow Agreement of October 29, 1963 as security for subscribers to the Extended Benefits coverage, or such of it as the Commissioner finds necessary, be retained by the Treasurer of State, subject to the Commissioner's order, pending the termination of outstanding Extended Benefit contracts.

*So ordered.*