**Leslie R. DICKINSON et al.**

v.

**MAINE PUBLIC SERVICE CO.**

**Harold E. SCOTT et al.**

v.

**WOODLAND WATER & ELECTRIC CO.**

Supreme Judicial Court of Maine.

Oct. 21, 1966.

Rehearing Denied Dec. 22, 1966.

Lynwood E. Hand, New Limerick, for appellants.

John G. Feehan, Augusta, for Public Utilities Commission.

Roger A. Putnam, Portland, Richard B. Sanborn, Augusta, Francis A. Brown, Calais, for appellees.

Before WEBBER, TAPLEY, MARDEN, RUDMAN and DUFRESNE, JJ.

WEBBER, Justice.

These cases involve several petitions brought by persons residing within the franchised service areas of defendant public utility companies and seeking orders by the Public Utilities Commission requiring these companies to provide them with electrical service. In each instance the petitioners were members and customers of Eastern Maine Electric Cooperative, Inc., a rural electric cooperative organized pursuant to 35 M.R.S.A. Sec. 2801 et seq. Eastern was permitted to intervene in opposition to the granting of these petitions.

■ In Heath, et al. v. Maine Public Service Co., (1965) 161 Me. 217, 210 A.2d 701, under similar circumstances we construed the statutes then in force and held that Eastern was not a public utility and had no franchised area. A short time after this decision was rendered and presumably as a result thereof, the legislature enacted certain amendments (P.L.1965, Ch. 348) which provided that cooperatives "shall be deemed to be public utilities" and guaranteed all suppliers of electric service immunity from competition in their service areas. These amendments became effective September 3, 1965 while these petitions were pending but before decision thereon by the Commission. The Commission subsequently dismissed the petitions, basing its action on the change in the law wrought by these legislative amendments. The Commission as a quasi judicial tribunal very properly assumed the constitutionality of the new legislation.

The issues thus presented are:

1. Are these petitions governed by the law as it existed prior to the effective date of the statutory amendments?

2. Do the provisions of P.L.1965, Ch. 348 violate constitutional principles?

■ We are satisfied that petitions before the Commission pending but not decided on September 3, 1965 were thereafter governed by the statutes as then validly amended. 1 M.R.S.A. Sec. 302 provides in part: "Actions pending at the time of the passage or repeal of an act are not affected thereby." In Webster v. County Commissioners, (1874) 63 Me. 27, 30 our court limited the meaning of "actions" as used in the statute to actions in courts of law and declined to safeguard a pending petition before county commissioners for the location of a way from the effect of a change in the statute. Like results were reached in Railway v. County Commissioners, (1895) 88 Me. 225, 33 A. 988 and Belfast v. Fogler, (1880) 71 Me. 403. In the instant case the rights of petitioners had not jelled. Even under Heath and the statutes in force prior to September 3, 1965 it was necessary for the Commission to determine the economic feasibility thereof before ordering a public utility to furnish requested service. We think the petitions which were pending before the Commission are not "actions" but are more properly denominated "proceedings" and are not immunized from a change

in statutory law during their pendency by the provisions of 1 M.R.S.A. Sec. 302. The Commission committed no legal error in so holding.

We turn then to the constitutional issue. Before the 1965 amendments an electric cooperative was recognized as being something other than a public utility. It could furnish service only to its own members (35 M.R.S.A. Sec. 2881(4)). By express statutory definition it was not deemed to be a public utility (35 M.R.S.A. Sec. 2809). It enjoyed no territorial monopoly and except in very limited areas was entirely free from regulation and control by the Public Utilities Commission. (35 M.R.S.A. Sec. 2809; Heath, et al. v. Maine Public Service Co., supra). It did not possess the power of eminent domain. (35 M.R.S.A. Sec. 2881(7)). Heath made it clear that a resident in the area in which an electric cooperative was rendering service to its members could nevertheless obtain service by direction of the Commission from a fully regulated utility upon a showing of economic feasibility. The obvious intention of P.L.1965, Ch. 348 was to change this situation drastically and to confer upon electric cooperatives rights and privileges heretofore reserved exclusively to fully regulated public utilities.

The amendments made no change in 35 M.R.S.A. Sec. 2881(4). As a result the electric cooperative still has no obligation to serve the public generally but is required and permitted to serve only its own members. Since as will be seen the cooperatives were given territorial monopoly, it follows that the only way in which a member of the public can obtain electric service in the service area of a cooperative is by becoming a member of that cooperative. P.L.1965, Ch. 348, Sec. 1 provided for territorial monopoly by amending 35 M.R.S.A. Sec. 2301 and adding thereto a new paragraph reading as follows:

"No person, firm, association, corporation or cooperative engaged in the transmission, distribution and sale of electricity shall construct or extend facilities, or furnish or offer to furnish electricity, for ultimate use and not for resale, to any premises which are already receiving electric service from another electric supplier or which are not receiving such service but are located within 1,000 feet of a distribution line of another electric supplier, except with the consent in writing of such other electric supplier. Where unserved premises are located within 1,000 feet of the distribution lines of more than one supplier, said premises shall be served by the supplier whose distribution line is located in closest proximity to such unserved premises."

Sec. 2 of the amending chapter repealed 35 M.R.S.A. Sec. 2809 and enacted in place thereof the following:

"Sec. 2809. *Limited jurisdiction of Public Utilities Commission*

Cooperatives shall be deemed to be public utilities and under the jurisdiction of the Public Utilities Commission for all purposes, except that their rates and their bonds, notes and other evidences of indebtedness need not be approved by said commission. In keeping and rendering accounts to the commission, they may use the system of accounting required of them by federal law and regulation. Any person who has been refused membership in or service by a cooperative or who is receiving inadequate service may complain to the Public Utilities Commission which may, after hearing, upon finding that such service may reasonably be rendered, order such person to be served with reasonably adequate service."

Sec. 3 struck from 35 M.R.S.A. Sec. 2881 (7) the provision that cooperatives should not have the power of eminent domain.

We are called upon to determine whether or not the cumulative effect of the 1965 amendments deprives the petitioners or the respondents of equal protection of the laws in violation of the Fourteenth Amendment of the Constitution of the United States and of Art. I, Sec. 6–A of the Constitution of

Maine. The whole body of public utility law has been developed here and elsewhere upon the concept of regulated monopoly. Implicit in this concept is an acceptance of the principle that a public utility offers its facilities and services to the public without discrimination and that it is obligated to extend its services as needed within its service area unless the supervisory agency determines that it is not practicable or economically feasible to do so. A public utility yields to the sovereign with respect to approval of rates, methods of financing and other matters of policy which are ordinarily within the sole province of management in private business. In return for relinquishing the right to determine without let or hindrance whom it will serve, what it will charge, or how it will finance or invest, it is usually given relative freedom from competition in its service area on the part of public utilities similarly regulated and controlled. The monopoly thus afforded as among competing public utilities is in effect a quid pro quo for the obligation to render public service and to submit to regulation and control. Monopoly granted and assured by the sovereign could not otherwise be justified within the framework of the constitution. This was the theory which undergirded our decision in Heath which held that a body which did not serve the public and did not submit to regulation and control was not a public utility and could not hold a monopolistic franchise.

Have the 1965 amendments effectively changed Eastern into a "public utility" which is justly entitled to legislative immunity from competition in its service area? We think not. At the outset we are troubled by the fact that Eastern serves and can serve only its own members. As already noted, if Eastern can properly be granted monopoly, the result is that a member of the public in that area who needs and desires service but who is unwilling to become a member of Eastern cannot obtain service elsewhere. There are many valid reasons why a person might prefer not to become a member of an electric co-operative. A member must be a customer but he is more than a customer. Qualifications and limitations in respect to membership are fixed by the by-laws (35 M.R.S.A. Sec. 2844) and might in some respects be legitimately distasteful to an individual. An individual might resist membership for the very reason that the cooperative is not fully subject to regulation and control by the Commission. Granted that he cannot arbitrarily be prevented from obtaining membership if he seeks it, we are only concerned at the moment with that member of the public who only desires to purchase electric service but who neither desires nor intends to become a member of a particular organization in order to make that possible. It cannot be said that a company which by force of law can render services only to its members is engaged in serving the general public.

This was a matter of concern to our own court in Gilman v. Somerset Farmer's Cooperative Telephone Company, 129 Me. 243, 247, 151 A. 440. Where a cooperative telephone company furnished service primarily to its own stockholders, but also offered its service through pay stations to the general public, the court determined that only because of and to the extent of its public offering could it be deemed to be a public utility. Courts in other jurisdictions, faced with some manifestation of this problem, have determined that a cooperative could not be deemed to be a public utility where it was restricted from serving the general public. Socorro Electric Coop., Inc. v. Public Service Co. (1959) 66 N.M. 343, 348 P. 2d 88; San Miguel Power Ass'n v. Public Service Com'n (1956) 4 Utah 2d 252, 292 P.2d 511; Inland Empire Rural E. v. Department of Public Serv., (1939) 199 Wash. 527, 92 P.2d 258; Clearwater Power Co. v. Washington Water Power Co., (1956) 78 Idaho 150, 299 P.2d 484.

In an apparent effort to overcome the difficulty posed by the fact that electric cooperatives do not offer service to the general public, the legislature has by the

1965 amendments expressly declared that such "[c]ooperatives shall be deemed to be public utilities." In Inland Empire Rural E. v. Department of Public Serv., (supra) the court dealt with an analogous situation and said at page 263 of 92 P.2d: "The question of the character of a corporation is one of fact to be determined by the evidence disclosed by the record. A corporation which is actually engaged as a public utility cannot escape regulation by the state merely because its charter or its contract characterizes it as a private corporation. On the other hand, a private corporation cannot be converted into a public service corporation *by mere legislative fiat.* What it does is the important thing, *not what it, or the state, says that it is.*" (Emphasis ours). We adhered to the same principle in Associated Hospital Service of Maine v. Mahoney, et al. (1965) 161 Me. 391, 407, 412, 213 A.2d 712, 721, 723. A horse cannot be converted to a camel by the enactment of a statute. We cannot conclude that Eastern is a "public utility" entitled to a territorial monopoly which could in practical effect exclude part of the general public from obtaining needed service, even though there exists a legislative fiat to the contrary.

There is another and equally persuasive reason for denying to Eastern the territorial immunity granted by P.L.1965, Ch. 348, Sec. 1. By excluding the fully regulated public utility from competition in a portion of its franchised area, the statute necessarily assumes that the cooperative is itself a "public utility" offering the same service to the public in its service area and therefore in direct competition with other public utilities, a competition which may be properly regulated and controlled. But if this be so, each competitor is entitled to equal protection of the laws and the scales may not be weighted so as to give one competitor an unfair advantage over the other. This was the teaching of Associated Hospital Service of Maine v. Mahoney, et al. (supra) wherein we said in part (at page 413 of 161 Me., page 724 of 213 A.2d): "The tax free and *relatively unsupervised competition* which plaintiff purports to supply in the health and accident insurance field is inconsistent with our system of free enterprise, violates the principles established in Maine judicature and results in unequal protection of the law." (Emphasis supplied). In the instant case the 1965 amendments, while conferring upon electric cooperatives all the advantages ordinarily conferred upon and reserved to *fully regulated public utilities,* nevertheless expressly relieves the cooperatives from any regulation and control of their rates and borrowings.

We find persuasive the reasoning of the recent case of Community Public Service Co. v. New Mexico Pub. S. Com'n, (1966) 76 N.M. 314, 414 P.2d 675, 677, 678. In that case the legislature amended its definition of "public utility" to include Rural Electric Cooperatives. Treating the cooperative as a public utility, the court said: "While we recognize that absolutely equal treatment of parties performing similar service is not demanded in order for a legislative act to withstand an attack on its constitutionality, * * * it is nevertheless imperative that where classification is attempted, the same must be reasonable and based on real differences bearing a proper relationship to the classification, *and there must be uniformity of treatment within each class.* * * * When we consider the additional facts that under its charter Otero [the electric cooperative] does not and cannot serve the public generally and does not have its rates controlled * * *, we cannot escape the conclusion that by comparison with Community [the fully regulated public utility] *it is at a decided advantage. This is what is prohibited* by the Fourteenth Amendment to the Constitution of the United States, and by Art. II, § 18, of the Constitution of New Mexico. * * * The equal protection clause protects against 'invidious discrimination.' To our minds, the invidious discrimination present in the legislation under consideration is too apparent to require elaboration." (Emphasis ours).

In the instant case, we conclude that the constitutional principle became operative at the point when the Legislature attempted to confer upon the cooperative the privilege of territorial monopoly. As long as it was recognized that the cooperative served only its own members and was not deemed to be a public utility, there was no obstacle to affording legislative relief from the burdens and rigors of regulation and control of rates and methods of financing. The determinative test was then whether or not it was economically feasible for a fully regulated public utility to render the service requested by members of the public in the franchised area. This was our holding in Heath. But when the effect of legislation was to confer upon the cooperative territorial immunity without at the same time imposing upon it the same requirements with respect to non-discriminatory public service, regulation and control as are imposed upon all competing public utilities offering the identical service, the competitors were thereby deprived of equal protection of the laws.

It follows that the petitioners are entitled to a determination by the Public Utilities Commission as to whether or not it is economically feasible for the fully regulated utilities to render the service requested by the petitioners.

So ordered.

Cases remanded to the Public Utilities Commission for further proceedings not inconsistent with this opinion.

WILLIAMSON, C. J., did not sit.

## ORDER ON MOTION AND PETITION FOR REHEARING AND RELIEF

WEBBER, Justice.

The intervenor Eastern Maine Electric Cooperative, Inc. moves for rehearing "on the Constitutional issue in the Law Court." This motion is denied.

The same intervenor requests that the Law Court "amend its decision to provide that the Commission take out evidence in regard to the underlying facts requisite for a proper determination of the Constitutional issue." This motion is denied.

The same intervenor requests that the Law Court "amend its decision to provide that the Commission determine the contractual issues involved in these proceedings as well as the economic feasibility issue." In our opinion (223 A.2d 435, at 440) we said: "It follows that the petitioners are entitled to a determination by the Public Utilities Commission as to whether or not it is economically feasible for the fully regulated utilities to render the service requested by the petitioners." Now and for the first time by this motion and petition it is brought to our attention that there may be issues other than "economic feasibility" in this case which may properly be considered by the Commission in making its determination as to whether or not the fully regulated utilities should be authorized and required to render the service requested by the petitioners. Our opinion was not intended or designed to preclude the Commission from considering or determining any issues bearing upon its ultimate decision and which would have been deemed appropriate for its consideration in the absence of P.L.1965, Ch. 348. We are not informed and therefore neither intimate nor suggest any view as to whether the so-called "contractual issues" referred to in intervenor's motion are issues appropriate for consideration by the Commission.

It is accordingly ordered that the opinion as certified be amended by striking therefrom the above quoted paragraph and substituting therefor the following:

"It follows that the petitioners are entitled to a determination by the Public Utilities Commission as to whether or not the fully regulated utilities should be authorized and required to render the service requested by the petitioners."

WILLIAMSON, C. J., took no part in the consideration of this motion and petition.