CHICAGO AND NORTH WESTERN RAIL-
WAY COMPANY, Appellant,

v.

X. T. PRENTIS et al., Appellees.

CHICAGO AND NORTH WESTERN RAIL-
WAY COMPANY, Appellant,

v.

Lynn POTTER et al., Appellees.

No. 52494.

Supreme Court of Iowa.

Sept. 5, 1968.

Rehearing Denied Nov. 12, 1968.

Frank W. Davis and Frank W. Davis, Jr., Des Moines, and George M. Hollander, Chicago, Ill., for appellant.

Richard C. Turner, Atty. Gen., and George W. Murray, Asst. Atty. Gen., for appellees.

SNELL, Justice.

Two cases involving the Chicago and North Western Railway Company's 1964 and 1965 ad valorem tax assessments determined by Iowa State Tax Commission were consolidated for trial and appeal. The Railway Company sought relief in the district court and appealed from adverse rulings.

Plaintiff railway company will be referred to as North Western. Plaintiff is authorized to do business in Iowa as a foreign corporation.

Defendant Iowa State Tax Commission is the administrative agency of the State of Iowa created under the provisions of chapter 421, Code of Iowa, 1962. The other defendants are the members of the commission and 56 county treasurers. The issues here involve the acts of the commission and its members. The defendants will be referred to as the Commission.

The actions arose under the Code of 1962. Unless otherwise indicated references will be to the Code of 1962.

North Western sought two remedies arising out of single factual situations. In Division I of its petitions in equity North Western sought writs of mandamus and prayed that the court direct the commission to convene, fix the assessed values of the property of the North Western for its 1964 and 1965 assessments at twenty-seven percent (27%) of the current fair market value of said property and to equalize and adjust the percentage of current fair market value at which the property of the North Western is assessed with percentages of current fair market value at which other railway companies and other properties in the State of Iowa are assessed.

In Division II North Western sought declaratory judgments declaring the actions of the commission in failing to equalize and adjust the 1964 and 1965 assessed values of its property with the 1964 and 1965 assessed values of other railway companies and other properties in the State of Iowa were null, void and of no effect, not done in an exercise of honest discretion, done in an arbitrary, illegal, fraudulent and capricious manner, constructive, if not actual and intentional fraud, and compelling North Western to bear an undue, unfair and disproportionate share of the tax burden of the State of Iowa.

As indicated the controversy arises from the dissatisfaction of North Western with the assessment of its property by the commission.

Operating property of railway corporations is assessed annually by the commission under the provisions of chapter 434 of the Code. The chapter does not provide for appeal to review the wisdom of the discretionary acts of the commission.

We agree with this from the trial court's conclusions of law:

■ This is an action of mandamus and not an appeal from an assessment. It is not the province of this court to fix or determine the value of plaintiff's property for tax purposes, but only to determine if the 1964 and 1965 assessments by the commission were arbitrary, capricious, fraudulent, and not the result of the exercise of discretion. If so determined, the court can only compel the commission to perform its legal duty. It is the burden of the plaintiff to establish not only that its assessment is excessive or that it is inequitable with respect to other property, but also that it is the result of arbitrary and capricious action of the assessor, and not the result of the exercise of discretion. The taxpayer must show more than mere difference of opinion as to values in order to sustain its burden.

As is frequently the case the litigants took divergent views of the trial court's approach and conclusions. Appellant claims the trial court, although recognizing the limitations on review, nevertheless performed assessment functions. The appellee praises the trial court for his thorough review of the voluminous record of highly technical testimony and complicated exhibits and ability as "an excellent statistician and a better than average accountant." We agree with appellee as to the trial court's diligence and ability.

I. Many of the same issues here presented were involved and decided in litigation over the 1963 assessment. See Chicago and North Western Railway Company v. Iowa State Tax Commission, 257 Iowa 1359, 137 N.W.2d 246, decided in 1965. Points of law therein recognized need. not be extensively discussed here. These points include:

■ (1). Considerable discretion is vested in taxing authorities in determining actual value of property. (loc. cit. 1370, 137 N.W.2d 246)

■ (2). The law contemplates the application of a just and reasonable judgment factor and defies any absolute mathematical formula for testing. The result can only be approximately correct. (loc. cit. 1371, 137 N.W.2d 246)

■ (3). Taxpayer's burden is not met by showing a difference of opinion between witnesses and assessing authority. Unless the valuation is grossly excessive and the result of the will and not the judgment the assessment will be sustained. (loc. cit. 1371, 137 N.W.2d 246)

■ (4). Equality of taxation requires a uniform rate of tax and uniformity in valuation. (loc. cit. 1371–1372, 137 N.W.2d 246)

■ (5). A sales-assessment survey is admissible and entitled to consideration. Its probative value depends on its scope and is not conclusive as a matter of law. (loc. cit. 1377, 137 N.W.2d 246)

■ (6). Actual value, market value and sales value, are not synonymous terms. (loc. cit. 1378, 137 N.W.2d 246)

(7). A 3-factor formula is used in Iowa and most states for determining a formula value for railroads operating in more than one state:

(a) The first factor is average annual net operating income for the preceding five years capitalized at 6%. A portion based on the extent of the operation in Iowa is then attributed to the value of the operating property in Iowa.

(b) The second factor is the average net stock and bond value for the entire system for the preceding five years with the portion attributable to Iowa determined by the same allocation formula.

(c) The third factor is the reproduction cost of operating property actually situated in Iowa, less depreciation, less a uniform 40% deduction for obsolescence, also allocated.

The three factors averaged together result in the so-called "formula value" in Iowa.

To this figure is applied a judgment factor by the taxing authority and the final result is taken as the actual value which is then assessed at 60% to obtain the assessed value under the provisions of section 434.15, Code of Iowa. (loc. cit. 1365, 137 N.W.2d 246.)

In applying these rules in the former case we held there was discrimination between the North Western and other railroads but the evidence was insufficient to show discrimination between North Western and other real estate (locally assessed real estate).

II. North Western, appellant, stated the issues in the present case as follows:

1. Is North Western valued at its current fair market value?

2. Is the property of North Western assessed at a higher percentage of its current fair market value than the percentage of current fair market value at which the property of other railway companies is assessed?

3. Is the property of North Western assessed at a higher percentage of its current fair market value than the percentage of current fair market value at which other real property subject to taxation, both urban and rural, is assessed?

4. Has North Western sustained its burden of proving that the acts of the Commission were done in an erroneous, arbitrary, illegal, fraudulent and capricious manner?

5. Is North Western entitled to a declaratory judgment and a writ of mandamus?

■ This statement of the issues is correct if it is kept in mind that we may not substitute our reaction to the evidence for the factual conclusions and discretionary acts of the commission. To reverse we must find that the commission acted in an arbitrary, capricious, illegal and fraudulent manner. The fact that we might disagree with the commission is not enough.

The plaintiff's burden is heavy.

Fourteen witnesses were called by plaintiff. Two were called by defendant. Voluminous exhibits and statistical data were offered and received. The witnesses were highly qualified and experienced in their fields.

The printed record before us is in 9 volumes with over 3300 pages. Detailed analysis of the testimony of the several witnesses is not justified or possible within reasonable space limitations.

Exhibit #221 entitled "Appraisal of Railroad and Other Public Utility Property for Ad Valorem Tax Purposes", a unit valuation report prepared by a committee of National Association of Tax Administrators, was received in evidence by stipulation (Exhibit #1.) This exhibit discusses in detail the many facets of the factors involved in fixing assessed valuations and the problems involved. The different formulas depending on the approach to the problem were discussed. We quote from pages 8 and 9:

"From what has just been said, it is clear that the Committee does not believe in slavish adherence to a formula. But we are equally sure that good results will not flow from the total rejection of formulas. We subscribe, rather, to the viewpoint aptly expressed by the late Thomas S. Adams when he said: 'A method of valuation taking the various factors into account in a rigid mechanical way should be used as a datum line or point of departure. The valuation so secured would have a presumption in its favor and should be changed only for cause.' As long as formulas are used to crystallize the assessor's judgment and not to stifle his judgment, we would agree that they are essential to an orderly, equitable assessment process.

"The state statutes and court decisions have delegated to the assessor the exercise of judgment. But judgment implies knowledge of the subject being judged. * * *

"Long ago, Ptolemy, King of Egypt, asked Euclid, a famous mathematician, whether there was some easy way to master the science of geometry. Then came Euclid's famous reply: 'There is no royal road to geometry.' Neither is there a royal road to value. Value is a relative thing; there is no such thing as 'intrinsic value.' Value cannot be measured with the assurance of accuracy that we measure a pound, an hour, or a mile. * * *"

This is from page 61 of the same exhibit:

"In the assessment of these complex properties, or of property generally for that matter, there is no such thing as one and only one answer. Value is a relative thing."

The trial court referred to this exhibit as follows:

"A widely accepted approach to the valuation of a railroad for ad valorem tax purposes is set forth in the book or pamphlet entitled 'Appraisal of Railroad and other Public Utility Property for Ad Valorem Tax Purposes', published in June of 1954 by the National Association of Tax Administrators. This is in evidence as Exhibit 221. In general, the method of valuation outlined therein considers and uses three elements or factors as evidence or indicators of value, as follows: (1) capitalized earnings, (2) market value of stock and debt, and (3) either original or reproduction cost less depreciation.

"Some judgment is involved in the use and application of a formula itself. Rate of capitalization of earnings, determination of operating and non-operating income, rates of depreciation and allowance for obsolescence are all matters involving some judgment within a rather narrow scope, so if these judgments are exercised within reasonable limits and applied uniformly to all railroads, formula values represent a rational and objective approach in the valuation and assessment of railroad property.

"It is also recognized that formula values based on the three factors are not fully conclusive of value and that there is room for the exercise of informed and intelligent judgment by the appraiser or assessing body. * * * This additional consideration has been referred to as the 'judgment' factor, and some deviation from the formula valuation through the exercise of the judgment factor is expected. A capitalized earning value in the formula is necessarily based on past earnings, and there may be cogent reasons for believing that past earnings are not indicative of future earnings. Similarly, average stock and debt values for prior years may not be indicative of present value. Labor disputes affecting operations, casualty losses, prospective gains or losses in traffic are some of the matters which might be considered in exercising the judgment factor to vary the formulaic valuation. A variation of 15 percent from the formulaic valuation as a result of the exercise of the judgment factor would not be unreasonable. See: Page 61 of Exhibit 221. Utilizing several of the indicators of value tends toward objectivity and equality in the assessment of railroad or public utility property, and provides an important basis on which to exercise a value judgment.

"The formulaic approach, with some variations or modifications, is used by most states assessing railroads for ad valorem tax purposes. The Commission has purported to use a formulaic approach for the valuation of railroads operating in the state for many years. * * *"

This approach is in accord with our 1965 opinion, supra, Division I.

III. Five railroads represent about 85% of the Class I railroad property assessed in Iowa. Only the physical property located or used in Iowa in the operation of the railway is subject to taxation here (section

434.15, Code of Iowa). In the case of interstate carriers the system valuations are determined and allocated proportionately to the several states. As assets and distribution thereof change from year to year there is a responsive change in allocation. The allocation factors are not in dispute.

Formula worksheets are prepared for commission use.

A summarized computation of the formula worksheet for North Western for 1964, as shown by Exhibit 145, is as follows:

|  |  |  |
|---|---|---|
| I. Average Net Operating Income for 5 years (1959–63) | $ 3,399,327. | |
| Capitalized at 6% | 56,655,450. | |
| 20.867% allocated to Iowa | | $11,822,293. |
| II. Average Stock and Bond Value for 5 years (1959–63) | $146,498,315. | |
| 20.869% allocated to Iowa | | $30,569,803. |
| III. Reproduction Cost Less Depreciation of Iowa Property at 1941 prices | $ 72,287,660. | |
| Less obsolescence | 28,915,064. | $43,372,596. |
| Total | | $85,764,692. |
| Formula Value Allocated to Iowa | | $28,588,231. |

A summarized computation of the formula worksheet for North Western for 1965, as shown by Exhibit 150, is as follows:

|  |  |  |
|---|---|---|
| I. Average Net Operating Income for 5 years (1960–64) | $ 4,720,140. | |
| Capitalized at 6% | 78,669,000. | |
| 20.723% allocated to Iowa | | $16,302,577. |
| II. Average Stock and Bond Value for 5 years (1960–64) | 151,579,976. | |
| 20.723% allocated to Iowa | | $31,411,918. |
| III. Reproduction Cost Less Depreciation of Iowa Property at 1963 prices | 103,745,124. | |
| Less obsolescence | 41,498,050. | $62,247,074. |
| Total | | 109,961,569. |
| Formula Value Allocated to Iowa | | 36,653,856. |

———◆———

A substantial improvement in the position of North Western is indicated by comparison of these two worksheets.

These data sheets are completed by the commission's chief tax analyst and are tentative valuations. North Western was granted a hearing before the commission and presented its case for lowered assessments. Statistical data and comparison charts were presented.

Our problem is not with the accuracy of figures or computations. The problem is whether the commission acted illegally in the use thereof.

In considering the several factors we follow the same chronological order as in Division I(7), supra, and as did the trial court.

IV. The capitalized earnings factor is the net railway operating income referred

to by stipulation as N.R.O.I. The figures used are the average annual net railway operating income for the preceding five years as reported to the Interstate Commerce Commission pursuant to its Uniform System of Accounts for railroad companies.

The commission over the years has been accepting this operating income as reported by the various railroads and has capitalized it at the uniform rate of 6%.

In Division V, infra, we recognize the difficulties in determining stock and debt values. Similar problems appear in allocating receipts to income. For example, Mr. Reeves observed that North Western for a number of years has lived substantially off the sales of surplus land and will continue to do so for some time.

The 1964 officers' report to shareholders (Exhibit 108) says that real estate sales in 1964 resulted in a net gain of $10,967,000. Of this net gain $2,492,000 was credited to income and $8,475,000 was credited to retained income and included in special credits.

The method of determining net operating income was summarized by the trial court as follows:

"Under the Uniform System of Accounts all income from carrier operations is segregated into a number of railway operating revenue accounts. Similarly, all expense attributed to carrier operation is segregated into a number of railway operating expense accounts. These accounts are referred to by railroad accountants as 'above the line' accounts, and, when balanced against one another, reflect net railway operating income (hereinafter referred to as N.R.O.I.)

"Under the Uniform Systems of Accounts the term N.R.O.I. has a rather definite meaning. The accounting procedures are sufficiently definite to provide uniform data from different railroads as to their financial operations and conditions.

"Ordinarily physical assets (except land) having a service life of a period of years are depreciated each year and a part of the cost of the assets charged as an operating expense each year during the service life of the asset. This is true as to most of the operating property of a railroad under the Uniform System of Accounts. However, under the Uniform System certain of the road accounts, notably rails, ties and ballast, are not subject to depreciation each year, but as these items wear out and require replacement, the costs of replacement are charged as operating expenses. These items remain in the property accounts of the railroad at their original cost without reserve for depreciation. When a particular piece of road is retired, the railroad's investment in rails, ties and ballast (ledger values), less salvage, are ordinarily charged to an operating expense account (Account No. 267) and credited to the particular property account. This procedure in effect allows a railroad to recover its investment in rails, ties and ballast as an operating expense in the year of retirement of the road, rather than a portion of its investment each year during the service life of the property in the form of depreciation. However, the Uniform System of Accounts provides that with the approval of the I.C.C. a railroad may charge the loss from retirement of nondepreciable assets to a retained income account (Account No. 613), or in an investment account (Account No. 80) rather than to the operating expense account (Account No. 267). When this alternative is followed the loss is not reflected in N.R.O.I. When such losses are material in relation to current income, I.C.C. approves the practice of charging such losses to other than the operating expense account (No. 267).

"In each of the years 1959 through 1964 the North Western obtained approval of the I.C.C. to charge losses from the retirement of nondepreciable property to 'below the line accounts' rather than to operating expense Account No. 267. The amounts of these losses were substantial and were material with respect to current income each year. It appears that during these years the North Western sought to retire

as much of its uneconomic road as possible, and its losses from retirement of undepreciable property greatly exceeded those of comparable Class I railroads operating in Iowa (Exhibit P–374). Over the six year period, 1959 to 1964, inclusive, the North Western had nondepreciable property retirement losses in the sum of $11,825,230. Of this amount, $10,906,015 was charged to below the line accounts. The N.R.O.I. for these years, as reported to the I.C.C. in its Form A Report and in its Stockholders Report, did not reflect the portion of these losses charged to below the line accounts. For these years in its Steam Report to the Commission the North Western adjusted its N.R.O.I. figure by deducting the losses from retirement of nondepreciable property which were not charged to operating expense Account No. 267. The adjustments were clearly set forth and specifically pointed out in the Steam Report. The adjustments were also discussed with the personnel of the Commission in charge of processing the railroad data and reports and with members of the Commission itself. At no time during these years did the Commission question the propriety of these adjustments or ask for additional information or explanation concerning them. There was no concealment or nondisclosure by the North Western with respect to these adjustments."

Plaintiff's witnesses were not in agreement with the commission as to the proper rate of capitalization. Dividend and interest rates on other investments were compared and the factors that would attract an investor were discussed.

Mr. Krucks, Director of Taxation and Assistant Treasurer of plaintiff, qualified and experienced in accounting and taxation testified at length. His testimony covers 959 pages of the record. He used an 8% rate to capitalize N.R.O.I.

Mr. Travis, a consulting valuation engineer, qualified and widely experienced as a valuation engineer of utility and railroad property, discussed at length the allocation of various items (including tax refunds and strike insurance) to N.R.O.I. He used 7½ percent as the capitalization rate. The difficulty of the problem is indicated by his testimony:

" * * * [In] the appraisal process probably there is no one item that caused more grief and more arguments than the rate of capitalization. I have approached this in various ways. There are several ways of doing it. * * * I have been overly cautious and I have gone to 7½ percent as the capitalization rate. * * *

"There's nobody that has the exact figure. It isn't something that is an exact amount that you can find someplace."

Mr. Reeves, Vice President of University of Alabama for Huntsville and Professor of Political Science, was equally qualified and experienced. He used a 6½ percent capitalization rate and called it on the low side of reasonable.

It has been said frequently that courts and judges should admit knowing what everyone else knows. We are fully aware of economic trends and conditions and the lack of attractive returns on many investments. Times and conditions are changing. We recognize that many outstanding economists now say that a capitalization rate of 6 percent is too low but what we might resolve in that area of accounting is not controlling. There is a difference of opinion and we are not inclined to overrule our previous pronouncements as to the discretion of the commission by invading the fields of finance and accounting.

We quote from Florida East Coast Railway v. Green, Division XIII, infra: "Judges are not selected because of their abilities as appraisers of property or their capacity to predict the economic future of business ventures. * * *"

We have said so recently as to make extensive review unnecessary, the taxpayer's burden is not met by showing a difference of opinion. Much more is required. See

Divisions I and II, supra, and authority cited therein.

■ Plaintiff's witnesses were men of outstanding ability. Their opinions are entitled to weight and their reasons quite persuasive that a 6 percent capitalization rate is low, but we cannot say that in allocating items to income and in following its long established rate the action of the commission was arbitrary, illegal fraudulent and capricious.

V. The second factor used in determining system value is the average net stock and bond value.

See Division I, supra.

Stock market prices are available and averages computed but are not necessarily indicative of true value. Prices fluctuate and are frequently distorted by rumor and speculation. This was pointed out to the commission by the tax commissioner for the Milwaukee Railroad on July 7, 1965. (Exhibit P–594)

"I should like to call your attention to the high market value of our stock for the year 1964. There is a reason for this distorted value. On August 17th our common stock was selling for 23.25 and our preferred for 72.50. On September 23rd a newspaper release carried the news that the managements of the Milwaukee and the Northwestern Railway Companies had agreed on terms for a proposed merger. This announcement had an immediate effect upon the market and the common stock on that day sold for 35 and the preferred at 76. On December 30th, the common was selling for 28⅞. I believe you gentlemen should consider this when you use the market value of our securities for this year's assessment."

In 1964 the average market value of North Western common stock was $49.30. In March 1966 the stock sold for $130.00 per share. No rational basis for the increase was suggested except speculation and investors' anticipation.

In spite of the obvious uncertainties inherent in stock market prices an average derived therefrom is a starting point.

Nonoperating property is deducted from the full stock and debt value. In computing this deduction the commission has computed and adjusted nonoperating income, capitalized the result at 6 percent and deducted this figure from the total stock and debt value.

Differences of opinion develop over allocation or designation of income as operating or nonoperating. The difficulty in this area is recognized in the unit valuation report referred to in Division II, supra. "No hard and fast rule can be laid down on the best method of dealing with exclusions from the gross stock and debt valuation."

In capitalizing nonoperating income as a basis for computing stock and debt values such items as strike interruption insurance, state and federal tax refunds, gains from the sale of stock in other corporations and gains from sale of real estate were involved.

■ No useful purpose would be served by our discussion of the various indicators of value that appear. Apparently they were considered. There was lack of uniformity in reporting market value by comparable railroads. North Western used an average of monthly highs and lows. Burlington used par value. Some companies used estimates. There is nothing to indicate that the commission acted with a lack of understanding or in an arbitrary, illegal, fraudulent or capricious manner.

VI. The third factor used in Iowa in computing a formula valuation is reproduction cost less depreciation. See Division I, supra. This factor is referred to as R.C.L.D. This information is called for by the commission. The forms furnished by the commission refer to property accounts as prescribed by the Interstate Commerce Commission. Tremendous variations appear in the various computations by I.C.C., the North Western and the commission depend-

ing on the date taken, the effect of reorganization, depreciation and obsolescence.

The effect of obsolescence has been great. For example, once powerful and costly steam locomotives have been retired.

The commission has recognized obsolescence by reducing R.C.L.D. by 40% when including this factor in its formula valuation.

Plaintiff's valuation witnesses used a two factor approach and rejected the three factor approach used by the commission. Mr. Travis testified:

"There is another indicator of value which I looked at. I will say flatly that I didn't give any consideration as to the cost indicator value. * * * Cost I do not consider at the present time and haven't for the last 15 years as an indicator of value for railroads. * * *"

The commission's approach is more in accord with our previous holdings and this from Exhibit 221:

" * * * it would appear that reproduction cost should be included in the family of value evidences in determining the market value of railroad property. The weight it should be accorded in any particular instance, however, can be determined only after a complete survey and analysis of facts in the particular case. Here, as elsewhere in valuation procedure, there is no substitute for the assessor's good judgment."

We find nothing to indicate the commission was beyond the scope of its discretion in using a three-factor approach that we have previously approved.

A similar attempt to disregard reproduction cost was rejected by the Supreme Court of Illinois in Chicago and North Western Railway Co. v. Department of Revenue, 6 Ill.2d 278, 128 N.E.2d 722. We quote:

"The physical value of property, shown either by reproduction cost or historical cost, has been held to be an important fac-

tor in fixing values for taxation purposes. [loc. cit. 726, 128 N.E.2d loc. cit.] * * * In our opinion the authorities do not warrant ignoring the physical value of railroad property in determining its assessed value under ordinary circumstances. * * *" [loc. cit. 727, 128 N.E.2d loc. cit.]

In that case the Illinois Court considered and rejected many of the same issues as raised in the case before us.

Railroad property is not the only class of property that suffers diminution in value through obsolescence. Extensive buildings on small farms are considered by investors as liabilities rather than assets but are still assessed.

Taxpayers are generally unhappy and the clamor for relief is universal but until the result reaches the point of illegality the problem is legislative and not judicial.

VII. Section 434.15 Code of 1962, provides that the commission should take into consideration the gross earnings per mile for the year ending January 1 preceding.

Plaintiff claims discrimination when compared with other railroads. The tabulations and charts showing gross revenue per mile of road show North Western to be lower than three and slightly higher than one of the five comparable railroads. It also appears that North Western has more track mileage than any other railroad operating in Iowa. North Western has branch lines with a low traffic volume. This was obviously considered by the commission in fixing the assessment per mile at less than the other roads.

"A difference not shown to be the result of caprice or intentional discrimination is not enough to invalidate the assessment." Chicago and North Western Railway Co. v. Department of Revenue, supra, loc. cit. 728, 128 N.E.2d loc. cit. 728.

There was a difference of opinion between plaintiff's witnesses and the commission, but the evidence does not show the action to be arbitrary or capricious.

VIII. Equality of taxation requires uniformity in valuation. In our 1965 decision we held the evidence insufficient to show discrimination between North Western and locally assessed property. See Division I, supra. In that case we said that the evidence of market value was admissible but too narrow and limited in its scope to establish "either as a matter of fact or of law that the sales-assessment ratio was conclusive of the assessment rate of property generally in the state." That case involved the assessments for 1963. Since then more extensive surveys have been made and data compiled.

Section 441.21, Code of Iowa provides in part:

"In arriving at said actual value the assessor shall take into consideration its productive and earning capacity, if any, past, present, and prospective, its market value, if any, and all other matters that affect the actual value of the property. * * *"

On July 23, 1963 the commission issued a memorandum to local assessors providing:

"The Commission expects all assessors in this state in their valuing, listing, and assessing all classes of real property in the year 1965, as of January 1st of that year, to see to it that the assessed values of all taxable real property are not less than twenty-seven (27) percent of the current fair market value of such property, and the Commission likewise expects all local boards of review in their review of such valuations and assessments to consider this Memorandum."

Reports of thousands of sales were made to the commission. One Hundred Sixteen Thousand Eight Hundred Ninety-seven (116,897) sales during a 3-year period were studied. It appears without dispute that the level of assessment is not in excess of 27% of the current fair market value of locally assessed property. North Western now claims that its property is assessed at more than 27% of its actual value and discrimination appears.

The difficulty arises because there is no basis for comparison of railroad property to farm lands, homes or business buildings.

Railroads are not bought and sold as are farms, homes and buildings. In November 1960 the North Western bought the physical assets of the Minneapolis and St. Louis Railway but one sale of physical assets would not establish a pattern of sales-assessment ratios.

With no sales of railroads upon which to compute a sales-assessment ratio to value some other approach must be used.

The testimony as to value of North Western showed a wide range depending on method of approach and factors included.

Plaintiff's computations were as low as between 19 million and 20 million (for tax purposes). (Mr. Reeves' computations Exhibit P-449) Defendants' formula worksheet recomputed for 1964 allocated a formula value to Iowa of $69,182,825.00, (Exhibit D586B) and a 1965 value of $68,241,098.00 (Exhibit D585B).

To these figures the commission apparently applied a judgment factor in 1964 by reducing the actual value to $28,588,230.00, then deducted locally assessed interstate bridges and found the final net 60% to be $16,470,094.00.

For 1965 the commission reduced actual value to $27,032,568.00, deducted locally assessed interstate bridges and found the final net 60% to be $15,536,697.00.

The difficulty in comparing assessment-value ratios arises at least in part from the use of figures based on fiction rather than reality.

Section 441.21, Code of 1962, provides that property shall be valued at its actual value and assessed at 60% of such value. It also provides that the actual value may be ascertained and determined to be one and two-thirds times the assessed value as shown by the assessment rolls. These provisions in the same section limit assessed value to 60% of the actual value and tie

determination of actual value to the assessment roll. This procedure locks the two together as each is computed from the other and rather effectively prevented reflecting market value. The result was that assessors used as actual value a figure that was actually less than one-half the market value and then figured 60%.

To illustrate this fiction (justifiable only for the purpose of holding down taxes) if a property had a market value of $200, its actual value was listed as $100 and assessed at $60. The actual result was that property was generally assessed at less than 30% of market value.

This was recognized by the commission's survey and approved by its directive memorandum. See quotation, supra.

Although not controlling in the case at bar, tried before the act was passed, the legislature has now legalized a comparable but more flexible computation by providing for assessment at 27% of the fair and reasonable market value. See chapter 354, Laws of the 62nd General Assembly.

We have said in prior divisions that we do not find the computations of the commission arbitrary and capricious. If the computations of the commission are accepted North Western has not been assessed out of line with other property.

It is apparent that determination of assessment-value ratio depends on whose figures are used.

If North Western figures are used the assessment ratio is too high. If the commission's high figures are used the assessment ratio is less than 20%. The judgment factor permitted the commission has influenced the final figure.

North Western's reports to the commission were pessimistic as to values. That railroads have serious problems is common knowledge. Costs, labor problems, declining revenues from some services and lines and competition are ever present issues. However, plaintiff's management is optimistic and reflects a better future. The 1964 report to shareholders begins as follows:

"To the Shareholders:

"The year 1964 marked an important milestone in your company's progress. In December, a dividend of $3.00 a common share was declared, payable quarterly throughout 1965. This is the first declaration of a dividend on the company's common stock since December 1950. All classes of your company's securities are now providing a current return to their owners.

"For the second year in succession, the year 1964 resulted in the highest freight revenues in your company's history. Net income was slightly less than in 1963 due to the absorption of net increases in wage and fringe benefit costs of $5,198,000, principally in the last three months of the year. The transportation ratio (the ratio of the expense of moving trains to revenue, and an accepted measure of railroad efficiency) continued to fall and was again the lowest of any year since the war year 1945.

"Once again, in 1964 as in 1963, both revenues and net income from suburban operations were the highest in the company's history. We believe that we are providing unequalled commuter service, and we intend to merchandise it aggressively in the future as we have in the past. We look forward to its further growth and profitability."

IX. Plaintiff-appellant's excellent and exhaustive brief and comprehensive argument covers many legal propositions with which we are in accord. We will mention only a few of the supporting authorities.

X. "The Constitution and Laws of Iowa require that all real estate subject to assessment be valued and taxed under laws of a general nature having uniform operation." Iowa Const. Art. III, § 30. Iowa Const. Art. VIII, § 2. Sections 421.17, 434.15, 439.1, 441.21 and 441.47, 1962 Code of Iowa. Chicago G. W. Ry. Co. v. Kendall, 266 U.S. 94, 45 S.Ct. 55, 69 L.Ed. 183 (1924), 45 S.Ct. 55; Sioux City Bridge

Co. v. Dakota County, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923); Wyandotte Chem. Corp. v. City of Wyandotte, 199 F. Supp. 582 (E.D.Mich.1961); Delaware L. & W. RR. v. Kingsley, 189 F.Supp. 39 (D.N.J.1960); Chicago, M. & St. P. Ry. v. Kendall, 278 F. 298 (S.D.Iowa 1921).

Our pronouncements have been in accord. Pierce v. Green, 229 Iowa 22, 53, 294 N.W. 237, 131 A.L.R. 335; Division 1(4), supra.

■■■ XI. "Gross discrimination in the assessment of railway property is erroneous, arbitrary, illegal, fraudulent and capricious." We agree. Great No. R. Co. v. Weeks, 297 U.S. 135, 56 S.Ct. 426, 80 L.Ed. 532 (1936); Chicago G. W. Ry. v. Kendall, 266 U.S. 94, 45 S.Ct. 55, 69 L.Ed. 183 (1924); Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923); Bailey v. Megan, 102 F.2d 651 (8 Cir. 1939); Chicago and North Western v. State Tax Commission, supra, 257 Iowa loc. cit. 1373, 137 N.W.2d 246.

■■■ It is not necessary to show actual fraud. Constructive fraud is sufficient. Pierce v. Green, supra, 229 Iowa loc. cit. 53, 294 N.W. 237.

XII. Evidence showing the level of assessment of other property was admissible. Division I(5), supra.

XIII. It appears without serious controversy that appropriate administrative procedures were followed and hearings held by the commission. Exhibit #162, the formal record of the commission hearing on the 1964 assessment, shows the consideration of pertinent data including the information furnished by the taxpayer and the action of the commission. Exhibit #167 is a comparable record for 1965.

The nub of plaintiff's complaint is that the commission did not accept and adopt plaintiff's arguments and thereby reached the wrong result.

In Chicago, Burlington & Quincy Railway Company v. Babcock, 204 U.S. 585, 27 S.Ct. 326, 51 L.Ed. 636, a railroad assessment case, Mr. Justice Holmes said:

"Various arguments were addressed to us upon matters of detail which would afford no ground for interference by the court, and which we do not think it necessary to state at length. Among them is the suggestion of arbitrariness at different points, such as the distribution of the total value set upon the Chicago, Burlington, & Quincy system, among the different roads making it up. But the action does not appear to have been arbitrary except in the sense in which many honest and sensible judgments are so. They express an intuition of experience which outruns analysis and sums up many unnamed and tangled impressions,—impressions which may lie beneath consciousness without losing their worth. The board was created for the purpose of using its judgment and its knowledge. [Citations] Within its jurisdiction, except, as we have said, in the case of fraud or a clearly shown adoption of wrong principles, it is the ultimate guardian of certain rights. The state has confided those rights to its protection and has trusted to its honor and capacity as it confides the protection of other social relations to the courts of law."

Chicago Great Western Ry. Co. v. Kendall, 266 U.S. 94, 45 S.Ct. 55, 69 L.Ed. 183 was an assessment case involving Iowa railroad assessments. At that time railways were assessed by the executive council. Plaintiff claimed its property was assessed at a higher percentage value than farm land. Mr. Chief Justice Taft said:

"The three judges in the District Court found that the Executive Council might reasonably and without arbitrary or intentional discrimination reach the conclusion that the properties of the two companies in Iowa, tangible and intangible, were not assessed by the Executive Council in proportion to their actual value substantially more than the 61 percent imposed on farm lands. The court pointed out that railroad values were very difficult to fix and there

was a wide range within which reasonable men might differ, and after an examination of the evidence, concluded they could not find that there was any arbitrary and unconscionable difference between the values assessed upon the two kinds of property. * * *"

We have recognized the judgment factor. Division I(1), (2), and (3).

Rowley v. Chicago and North Western Railway Co., 293 U.S. 102, 55 S.Ct. 55, 79 L.Ed. 222, was a railroad assessment case involving issues comparable to the case at bar, i. e. valuations, capitalization of income, market value of stocks and bonds, reproduction costs less depreciation, apportionment and discrimination. In upholding the commission against the claims of North Western the court said:

"The ascertainment of the value of a railway system is not a matter of arithmetical calculation and is not governed by any fixed and definite rule. Facts of great variety and number, estimates that are exact and those that are approximations, forecasts based on probabilities and contingencies have bearing and properly may be taken into account to guide judgment in determining what is the money equivalent—the actual value—of the property. [Citations] * * *

"The record shows that the board considered respondent's calculation. Refusal to accept that formula as the measure was not arbitrary. Respondent's use of the average of three ratios indicates that it realized that there were substantial objections against each as the sole test. * * * The other factors that are shown to have been considered by the board give substantial support to the percentage finally adopted as the basis of the assessment.

"There is nothing in this record to suggest any lack of good faith on the part of the board. Overvaluation resulting from error of judgment will not support a claim of discrimination. There must be something that amounts to an intention, or the equivalent of fraudulent purpose, to disregard the fundamental principle of uniformity. * * *"

One of the cases cited and quoted by appellant is In Re Chicago, Burlington & Quincy Railroad Company v. State Board of Equalization and Assessment, 170 Neb. 77, 101 N.W.2d 856, a Nebraska case decided in 1960. The case is interesting for its scathing denunciation of the tax commission's refusal to follow the law and as an illustration of how far prejudice will take some assessing authorities. That case is in no way analogous to ours as to either procedure or record. That case was a direct appeal from the assessment and the court was required by statute to review de novo and fairly determine the assessment. The commission offered no evidence to support its conclusions and the assessment was clearly in violation of the statute. The court left no doubt as to its disapproval. We quote excerpts:

"The assessment is in defiance of that recognized standard of value. * * *

"Appellee destroyed any trace of reasonableness or realism * * *.

"The original assessment order of July 15, 1959, was adopted by only two members of the board voting for it. One member voted against it, one member abstained from voting, and one member was absent. The use of the matter contained in section IV of the order of assessment was not a mistake, an inadvertence, or because of insufficient information. It was done advisedly and arbitrarily. The Tax Commissioner of the state advised against the use of it and presented a proposed order of assessment wholly eliminating that formula. The Tax Commissioner advised appellee that the facts and the law required a reduction in railroad valuations for assessment purposes. One of the members who voted for the assessment order as it exists for 1959 said in a voluntary, formal statement he would never be a party to extending the type of relief suggested to any special interest at the unavoidable tax

expense of Nebraska farmers, main street merchants, and homeowners. However, the same statement tacitly conceded that railroad property had been overassessed * * *. The other member who supported the 1959 assessment order said he opposed any concessions to any special interest group when the average taxpayer would have to make up the difference from his own pocket. Neither of these members mentioned anything concerning the value of the property to be assessed nor did they undertake to show where the judgment of the Tax Commissioner was wrong. * * *" (loc. cit. 866)

A recent pronouncement clearly in point and with issues comparable to ours except as to comparison to farm land appears in Florida East Coast Railway Company v. Green, Fla.App., 178 So.2d 355. Plaintiff alleged over-valuation and discrimination as compared to other railroads. The Assessment Board first applied a preliminary formula using the same three factors as used in Iowa. The result was then subjected to a judgment factor whereby the value was adjusted in the light of conditions peculiar to the particular railroad to determine the assessed value. Plaintiff argued for and the court rejected the theory that reproduction cost should be disregarded and a two-factor formula used. The court noted that 31 states gave some consideration to cost of reproduction. The court cited with approval the Illinois case (Division VI, supra) as the leading case on the propriety of considering reproduction cost. The court said the fundamental rule was found in the Rowley case, supra. The court then said:

"Under these circumstances we are not prepared to hold and cannot hold that the defendants' valuations of the plaintiff's properties for 1961 and 1962 were invalid for excessiveness as a matter of law. This conclusion is based not only on the authorities and considerations discussed above, but also upon our concept of the limitations of the power of the courts to review the actions of taxing officials charged by law with the responsibility of evaluating properties for tax purposes."

XIV. As we said in Division I, supra, many of the present issues were decided in our 1965 opinion. However, a difference in the factual premise should be noted. On page 1371 of 257 Iowa, 137 N.W.2d on page 253 this appears:

"The trial court held there was no excessive valuation of plaintiff's property shown, and no question is raised in this appeal as to the propriety of the commission's action in establishing the actual value of plaintiff's operating railroad in Iowa. The North Western's complaint is that the actual value and the assessed value of its property were arbitrarily and capriciously maintained near its formula value, while the other comparable railroads' actual value was inequitably reduced so far below their formula value as to disclose gross discrimination * * *."

There was little controversy over the accuracy of the reports or manner of accounting. We noted in Division IV, supra, that the commission had been accepting operating income as reported by railroads.

Such was not the case for the 1964 and 1965 assessments. Here there were differences. The commission did not accept the manner of accounting by North Western nor its comparability with the accounting of other railroads.

That there was lack of uniformity in the compilation and inclusion of various items appears without question. North Western in its Reply to Substituted Answer said: " * * * any lack of comparability between Steam Reports filed by plaintiff and those filed by other railway companies operating in the State of Iowa results from less detailed or incomplete reports by said other railway companies."

Plaintiff's position was explained to the commission and as found by the trial court there was no concealment or nondisclosure but that does not mean that the commission

was required to accept the plaintiff's final figures based on its own method of accounting.

As we have said in previous divisions the answer depends on whose figures and methods are used.

XV. From the reported cases it appears that North Western as well as other railroads have been fighting valiantly for years for the acceptance of accounting practices that would reduce their tax burden. There is nothing wrong with that. It may be that through the efforts of their counsel, accountants and appraisal engineers they will be able to convert taxing authorities to their cause.

However, it is not for us to fix values nor tell the commission whose figures must be used.

There is nothing in the cases before us sufficient to prove that the commission so far exceeded the discretionary power vested in it as to make its decision illegal.

The trial court was right.

The cases are

Affirmed.

All Justices concur.