544 P.2d 675

STATE of Arizona, County of Pima, State Board of Property Tax Appeals, County Board of Equalization, Pima County Board of Supervisors, Pima County Assessor, Pima County Treasurer and the Clerk of the Superior Court of the State of Arizona for the County of Pima, Appellants,

v.

RELLA VERDE APARTMENTS, INC., NO. 130–17–1870, et al., Appellees.

No. 2 CA–CIV 1930.

Court of Appeals of Arizona, Division 2.

Jan. 20, 1976.

As Amended Feb. 20, 1976.

Rehearing Denied Feb. 24, 1976.

Review Denied March 16, 1976.

Bruce E. Babbitt, Atty. Gen. by Donald P. Roelke, Asst. Atty. Gen., and Olgerd W. Kalyna, Special Asst. Atty. Gen., Phoenix, and Dennis DeConcini, Pima County Atty. by John R. Neubauer, Chief Civil Deputy County Atty., Tucson, for appellants.

Robert C. Stubbs & Associates, P. C. by Robert C. Stubbs and Charles L. Townsdin, Jr., Tucson, for appellees.

## OPINION

HOWARD, Chief Judge.

The main issue in this case is the validity of Equalization Order No. 5 promulgated by the State Board of Property Tax Appeals.

As a result of *Southern Pacific Company v. Cochise County,* 92 Ariz. 395, 377 P. 2d 770 (1963) and the legislation passed thereafter which requires a yearly update in the valuation of real property in the state, the Board embarked on a three-year program designed to bring the value of all such property up to full cash value.

Prior to the promulgation of the order in question, county assessors valued improved properties by using a cost approach and relying upon cost manuals devised by the State Department of Property Valuation. Because of the requirement of annual valuation this method was proving ineffectual in the larger counties of Pima and Maricopa since, by the time a certain class of property had been appraised, changing market factors rendered such appraisals obsolete.

It became obvious that some mass appraisal technique was necessary and there-

fore the State Department of Property Valuation employed a company called CBM to devise a mass appraisal system. Mr. Viegas of that company devised a formula using multiple linear regression (MLR) which would relate characteristics of buildings to market prices paid for them as is evidenced by affidavits of value filed pursuant to A.R.S. Sec. 42–1612. This computerized program was initially devised only for the assessment of single family homes. The implementation of the system by the county assessors proposed for the year 1973 an average 31% increase in the values of residential properties. This led to what appellants termed the "assessors' revolt" which resulted from their view that the use of the system would create a great increase in the value of residential properties without any increase in the value of commercial properties. The various county assessors were therefore hesitant to use the program.

The assessors turned for guidance to the State Board of Tax Appeals to whom they presented evidence at a formally conducted hearing in February of 1973. The Pima County Assessor accepted the new residential values as devised by CBM but the Maricopa County Assessor refused to do so. This hearing alerted the Board to the necessity for further orders to be issued in their equalization capacity.

The Department turned to CBM and Mr. Viegas for the creation of a computerized mass appraisal system. CBM developed such a system which analyzed the full cash values set by the assessor and compared them with sales data already on file. The sales data came from the affidavits of value which are required to be recorded with every deed or instrument of conveyance. These affidavits are subject only to a minimum amount of screening. A comparison of the assessor's value to the actual sale value resulted in a sales ratio. Using the analysis designed by CBM the Board developed certain multiplying factors to be applied to the properties which the Board felt were substantially undervalued as com-

pared with the general level of assessment throughout the counties as well as the state. The result was Equalization Order No. 5 issued on July 16, 1973 which stated:

"It is hereby ordered that the values of all properties in the various counties in the State of Arizona be changed as indicated by the application of the proper factor to the full cash value of the property of various land use classification codes in each map book as set out on the charts in the attached Exhibit 'A'.

The charts are broken down first by county, second by the land use classification codes developed by the Arizona State Department of Property Valuation, and third by the map books in each county.

The change in full cash value of each parcel so affected shall be determined by multiplying the proper factor indicated on the attached Exhibit 'A' by the existing full cash value of both land and improvements for each parcel within the book for the land use classification code number to which the factor applies.

Exhibit 'A' and its charts are hereby incorporated into this order and made a part of this order.

These changes by factoring, where necessary pursuant to this 1973 Equalization Order No. 5, are to be made after the action, ordered by the Arizona State Board of Property Tax Appeals in 1973 Equalization Orders No. 2, No. 3, and No. 4 regarding certain residential property in Maricopa, Pima, and Yavapai Counties, has been taken."

In this lawsuit appellees contended that Equalization Order No. 5 was unconstitutional in that it violates Article 9, Sec. 1 of the Arizona Constitution which requires that all taxes ". . . shall be uniform upon the same class of property within the territorial limits of the authority levying the tax, . . ." and offends the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States. They asked the trial court

to void Equalization Order No. 5 and return to them the taxes which they had paid under protest. It must be emphasized that appellees did not and do not now contend that their properties have been valued in excess of their full cash value as a result of Equalization Order No. 5. Instead, they claimed that as a result of Equalization Order No. 5 the State is treating various types of property in an unequal manner.

The trial court found Equalization Order No. 5 to be void as to appellees whose property was designated as 02 (duplexes), 03 (apartments), and 07 (condominiums and townhouses). As to the plaintiffs who were not in the foregoing category, the trial court ruled that their property was not affected by the judgment, and Equalization Order No. 5 was not void as to them or their properties.

Appellants have presented four questions for review, however, we need only discuss one since it is dispositive of this appeal. That question is whether Equalization Order No. 5 is void as to appellees who own 02, 03 and 07 property.

Appellants claim that appellees did not sustain their burden of proof on the issue of unconstitutionality. Appellees seek to uphold the decision of the trial court, in the first instance, by asserting that the overall method used by the State Board of Tax Appeals was without and contrary to statutory authority.

In order to arrive at the value of property within the state, the State Department of Property Valuation took the statutory classifications and further broke them down into more specific types of property, giving them a classification code. In all, there were ninety-five such types of property coded. As an example, residential property was broken down into nine types to wit: 01, single family; 02 double and duplexes; 03, apartments; 04, hotels; 05, motels; 06, resorts; 07, condominiums; 08, trailer parks; and 09, improved rural home sites (now subdivisions). In arriving at its property valuations the Tax Appeals Board

used the coded classifications promulgated by the State Board of Property Valuation. Furthermore, the Tax Board used the map books in Pima County to arrive at its estimation of full cash value. It must be stressed that the Board broke the statutory classes of property down into types only in determining the full cash value and not in determining the tax rate to be applied to such property.

Appellees claim that there is no statutory authority for valuing the property contained in the statutory classifications by breaking them down into specific types. They have cited to us cases from other jurisdictions which we have read and which are inapposite in view of the authority given by virtue of A.R.S. Sec. 42–143 which states:

"On or before its annual meeting in July, the board shall examine and compare the valuations of property in the several counties and if necessary equalize them so that all property subject to property taxation is listed on the rolls at its full cash value."

Prior to the amendment of A.R.S. Sec. 42–143 in 1967 and 1971, the foregoing statute contained the following language:

"B. * * *

1. If the board believes that the aggregate valuation of any class of property of a county should be raised or reduced without raising or reducing other classes of property of the county, or without raising or reducing it in the same ratio, the board may add to or take from the aggregate valuation of any class such percentage as it believes will raise or reduce such class to the full cash value thereof.

2. If the board believes that the aggregate valuation of any class of property of a city or town, or of any class of property of a county not in a city or town, should be raised or reduced with-

out raising or reducing other classes of property of the county, or without raising or reducing them in the same ratio, the board may add to or take from the aggregate valuation of any class of property of the city or town, or any class of property not in the city or town, such percentage as it believes will raise or reduce such class to the full cash value thereof."

■ The statute as it existed prior to 1967 stated that the foregoing rules were to be used in determining the assessment at full cash value. As can be seen, the legislature in amending the statute, no longer intended to prescribe the rules and methods which were to be used by the Board in arriving at full cash value. The statute thus gives the Board a very broad discretion, requiring only that the property be listed on the tax rolls at full cash value. The cases upon which appellees rely are inapposite since they involve statutes identical or similar to A.R.S. Sec. 42–143 prior to its amendment.

■ Appellants suggest that A.R.S. Sec. 42–143 as it was amended in 1974, after the date of Equalization Order No. 5, was amended specifically as a result of this lawsuit and as a clarification of the meaning of A.R.S. Sec. 42–143. They urge us to follow the rule of statutory construction that an amendment which construes and clarifies a prior statute, will be accepted as the declared intent of the legislature when it adopted the original act. *City of Mesa v. Killingsworth*, 96 Ariz. 290, 394 P.2d 410 (1964). It is clear that under A.R.S. Sec. 42–143 as amended, Laws 1974, Ch. 164, Sec. 7, the use of the classifications of property established by the Department of Property Valuation is specifically authorized. However, in view of the broad language of A.R.S. Sec. 42–143, as it existed prior to the amendment, we do not have to resort to the rule of statutory construction suggested by appellants. We do not find that the Tax Board abused its discretion by using the property classifications of the State Department of Property Valuation.

Appellees, in essence, mounted four attacks on Equalization Order No. 5. First, they attacked the use of the sales ratio and factors developed by CBM. Second, they attacked the method by which the sales ratios were specifically applied to their property. Third, they attacked the overall general method used by the Board in arriving at the factors to be applied under Equalization Order No. 5. Fourth, they attacked the failure to give them individual notice.

In attacking the use of the sales ratio and the factors subsequently developed, appellees contended that CBM used the wrong formula, that its methods were statistically unsound and that the sales used contained errors and were not indicative of full cash value. In arriving at the sales ratio in Pima County for apartments, the Board used the data produced by CBM which relied on 388 sales. Of these 388 sales, CBM, in order to compensate for gross variations which it believed would cause distortion of the result, rejected the highest 5% and the lowest 5% of sales. Furthermore, it clearly appears that CBM did not check the sales in order to determine whether or not there were infirmities in the sales which would detract from their use as indicators of full cash value.

An expert witness hired by the appellees examined the method used by CBM and concluded that it was statistically unsound and that the formula used by CBM in reaching its conclusions was incorrect. Mr. Viegas disagreed with the appellees' witness on the statistical soundness of this method and further testified that the difference between the formula which appellees' witness said was the correct one and the one he used was so trivial as to be unworthy of discussion.

Appellees put on witnesses who had checked some 100 of the 388 sales and concluded that the sales should not have been used because they did not represent fair market value. According to these witnesses, the property values included sums which represented the sale of personal property along with the realty. For this

and various other reasons, they concluded that the sales might be above or below market value. Furthermore, it was appellees' contention that the use of installment sales was erroneous since market value represents the amount which would be paid for the property in cash rather than the amount paid in installments.

The members of the Board testified that as far as the sales were concerned, they were under the impression that the sales had been screened prior to their use by CBM, but that in any event, because of the number of sales used, they did not believe that the errors submitted by appellees would have affected their decision. Furthermore, in arriving at the full cash value and sales ratio, the Board chose a factor by which the assessed valuation was multiplied resulting in a valuation representing only 80% of the property's full cash value.

In arriving at the valuation for apartment houses, the Board used the map books which are used by the county for identifying the location of property within the county. The Board first found the sales ratio for the entire county and determined that apartments were appraised at 67% of their full cash value. It then developed a factor of 1.194 by which the existing appraised value was to be multiplied. The Board then examined the sales in each map book, developing a sales ratio and factor for each individual map book when there were sufficient sales within that map book to justify the use of the sales ratio. Of necessity, this meant that the valuation of apartment houses would vary from map book to map book, since the development of a sales ratio in a given area depended upon the assessed valuation and sales within each map book.

Appellees' third assault on Equalization Order No. 5 can be broken down as follows: First, the sales ratio was only used by the Board in Maricopa and Pima counties and not in other counties. Second, the use of the sales ratio was not used at all in Greenlee County. Third, in some instances where the sales ratio study showed proper-ties to be undervalued, these properties were not increased by an amount which the sales ratio study showed was necessary to bring them to full cash value, and in other instances, the value of the property in other classifications was not raised at all, or was raised by an arbitrary figure of 5%.

Lastly, appellees attacked Equalization Order No. 5 on the ground that there was no notice to them pursuant to A.R.S. Sec. 42–144.

■■■ Taking appellants' last claim first, at the time Equalization Order No. 5 was promulgated, A.R.S. Sec. 42–144 provided:

"The state board of tax appeals may at any time require any county board of supervisors or the clerk thereof and the department to furnish statements showing the valuation of the property of any person within any county or within the state. The board shall consider and equalize such valuations and after hearing may increase or decrease the valuation of the property of any person, provided that no increase in any valuation shall be made without first giving at least five days notice, by certified or registered letter to the owner of the property to be affected at his address shown on the then existing tax roll, of its intention to do so and of the time and place of the hearing of the board at which such increase is proposed to be acted upon. . . ."

This statute was applicable only to *individual* increases of valuation by the Board. It did not apply to a general increase or review by the Board under A.R.S. Sec. 42–143 which, prior to its amendment in 1973 did not require notice of any kind. We do note that notice of contemplated increases in value by the Board were given in Pima County by publication and property owners were given an opportunity to express their views before the Board. However, notice to individual property owners is not required where a board of equalization or review makes a

general increase in the assessed valuations of all taxable property in a given division or district (or of all property under a certain class) because the statute does not require such notice, and such a notice requirement is not essential to due process of law. See *State ex rel. Miller v. Dwyer,* 208 Kan. 437, 493 P.2d 1095 (1972). See also Annot. 24 A.L.R. 331, Supp. 84 A.L.R. 197, "Tax Assessment-Increase-Notice".

■ This brings us to the vital issue in this case, the method used by the Board in arriving at assessed valuations. By what standard does the court judge the action of the Board? In its task of equalizing taxes, the Board was acting in a quasi-judicial capacity. In the very early case of *United Globe Mines v. Gila County,* 12 Ariz. 217, 222, 100 P. 774, 776 (1909), the court stated:

".  .  . [T]he court may only inquire into such action for the purpose of ascertaining whether the territorial board of equalization had jurisdiction to make the order, or to determine, when the issue be raised, whether the board of equalization acted in bad faith or so arbitrarily as to amount to constructive fraud in adopting its scale of valuation. .  .  ."

In the case of *Cochise County v. Southern Pacific Company,* 99 Ariz. 385, 409 P.2d 549 (1966), the Court quoted *United Mines* with approval and further stated:

"Although the Board acted on *incorrect* information, there was no showing that the rate was grossly excessive, or that the action of the board was in fact arbitrary or fraudulent." (Emphasis added) 99 Ariz. at 394, 409 P.2d at 555.

■ Finally, in *Security Properties v. Arizona Department of Property Valuation,* 112 Ariz. 54, 537 P.2d 924, 926 (1975), the Court stated:

"In *McCluskey v. Sparks,* 80 Ariz. 15, 291 P.2d 791 (1955), we said that to place the county assessor's conduct in a category of an unconstitutional assessment there must be more than a dispute between the taxpayers and the taxing officials as to valuations placed upon properties and that before a court will interfere, it must be clearly shown that the assessments which are unequal are the result of systematic and intentional conduct—in the sense that the inequality would thereby be deliberately created. .  .  ."

It is thus the law that the burden placed upon the taxpayer in challenging the equalization system is very heavy, and justly so. Appraising is not an exact science, it is merely an *estimate* of value. Indeed, the testimony in this case was that if two appraisers are within 10% of each other in their valuations of the full cash value of property they are both considered equally correct. While the courts can compel boards of equalization and assessors to act, no court can decide for them what their judgment ought to be. As was stated in *Danforth v. Livingston,* 23 Mont. 558, 59 P. 916 (1900):

"* * * The value of property is a matter of opinion, and there must necessarily be left a wide room for the exercise of this opinion. Absolute accuracy cannot always be obtained. Courts cannot be called upon, in every instance, to settle differences of opinion in this regard between the assessing officer and the property owner. Otherwise, courts would be converted into assessing boards, and, in assuming to act as such, would usurp the powers lodged elsewhere by the lawmaking branch of the government."

If we attempted to vary the standards used, courts would be embroiled in annual disputes between taxpayers and the assessing authority, and the legislative branch responsible for approving budgets and appropriations would be in a constant quandary.

■ In order to show that the use of the map book was improper, appellees pointed to two specific properties which on

their face showed that they may not have been treated equally. However, there was no proof that, on the whole, use of the map books sales ratio studies did not bring properties within the county nearer to full market value. If individual inequalities exist, then these property owners have a remedy by appeal to the State Board of Tax Appeals to correct their specific situations; but this is no reason to invalidate the entire system.

As far as the Board's failure to use the sales ratio on other types of property when the survey showed that a large discrepancy apparently existed, members of the Board testified that in some instances there were not enough sales to justify the use of the sales ratio and they therefore had to exercise their own personal judgment. In other instances the ratio was not used because the members. of the Board believed that there were too many individual differences among properties within that class to justify use of the sales ratio. In other cases it was not used because the Board believed that the price paid for the properties reflected future anticipated property value increments, the use of these increments being specifically prohibited by A. R.S. Sec. 42–123(A)(5). The Board felt that no increase in assessed valuation of some properties should be made because its assessed valuation, in their opinion, reflected full cash value and appellees presented no evidence that this was not true. In Greenlee County the sales ratio study was not used because the Board felt that because of the size of, and the limited number of properties in the county, the valuations by the county assessor were correct.

We are not able to find from the evidence any bad faith on the part of the State Board of Tax Appeals and there is no evidence that any inequality was deliberately created. Appellees did not establish systematic, intentional discrimination and there was accordingly no question presented as to the unconstitutionality of the assessment. *Security Properties v. Arizona Department of Property Valuation,* supra.

The judgment is reversed.

KRUCKER, and HATHAWAY, JJ., concur.