BOARD OF SUPERVISORS OF LINN COUNTY, Iowa, Merle L. Kopel as Auditor of Linn County, Iowa, and Forrest C. Holveck as Assessor of Linn County, Iowa, Plaintiffs-Appellants,

and

The Incorporated City of Cedar Rapids, Iowa, Donald Canney as an Individual and as Mayor of the City of Cedar Rapids, Iowa, and Dale Piersall as Assessor of Cedar Rapids, Iowa, Intervenors,

and

Ralph H. Blackford, Louise Blackford, Curtis J. Hayes, Ralph N. Gordon, Joyce A. Gordon and Milo Machula and Bessie Machula, Intervenors-Appellants,

and

Joseph Grief, Richard G. Liercke, William F. Olinger, Renald Evans, Michael P. Evans and Thomas J. Evans, Intervenors,

and

Linn County Farm Bureau, Intervenors,

v.

DEPARTMENT OF REVENUE of the State of Iowa and Gerald Bair, Director of the Department of Revenue of the State of Iowa, Defendants-Appellees.

Nos. 2-58954 and 2-59663.

Supreme Court of Iowa.

Feb. 22, 1978.

Eugene J. Kopecky, County Atty., and James W. Affedlt, Asst. County Atty., for plaintiffs-appellants.

Jon M. McCright and Walter L. McNamara, Cedar Rapids, for intervenors-appellants.

Richard C. Turner, Atty. Gen., George W. Murray, Sp. Asst. Atty. Gen., Kevin M. Maggio, Harry M. Griger and Michael Thompson, Asst. Attys. Gen., for defendants-appellees.

David F. McGuire, City Atty., and David P. McManus, Asst. City Atty., Cedar Rapids, for intervenors The Incorporated City of Cedar Rapids, Iowa, Donald Canney as an Individual and as Mayor of the City of Cedar Rapids, Iowa, and Dale Piersall as Assessor of Cedar Rapids, Iowa.

Wayne C. Collins and Gary J. Streit, Cedar Rapids, for intervenors Joseph Grief, Richard G. Liercke, William F. Olinger, Re-nald Evans, Michael P. Evans, Thomas J. Evans and Linn County Farm Bureau.

RAWLINGS, Justice.

By action for declaratory judgment and other relief plaintiffs and intervenors challenge the constitutionality of newly amended statutory procedure for implementing defendants' property tax equalization order. Plaintiffs appeal pretrial dismissal for lack of authority and standing to sue. Some intervenors appeal adverse adjudication on the merits. We affirm on both appeals.

Because this case primarily concerns the statutory procedure for effectuation of a property tax equalization order, a portrayal of relevant statutes and procedures prescribed therein necessarily prefaces any recitation of the involved factual situation.

Assessment and equalization of property values for taxation purposes are generally governed by Chapter 441, The Code 1975. That same year certain sections of Ch. 441 were amended by the legislature, effective August 15th. 1975 Regular Session of the Sixty-Sixth General Assembly, Ch. 205, hereinafter referred to as Ch. 205. The following procedural outline perforce refers to Ch. 441 before and after enactment of Ch. 205.

At the times here concerned, it was the duty of each county and city assessor to assess all real and nonexempt personal property within their respective assessing districts. § 441.17(2). Personal property was assessed every year. § 428.4. Real property was valued once every four years unless the assessor found certain property had changed in value since the previous assessment. Id. 1975 was a real property assessment year. Id.

Assessments were to be completed no later than April 15th. § 441.28. The assessor was required to notify, by April 1st, those persons whose property valuation had been changed. § 441.23. Extensive procedures for protest of such changes before the local board of review and appeal to district court were provided. See § 441.26 et seq. Eventually the assessor transmitted to defend-

ants, Department of Revenue and its director (Department), an abstract of the real and personal property within his or her district. § 441.45.

Subsequently, the Department adjusted assessed valuations pursuant to statutory and regulatory guidelines. § 441.47. Written notification of proposed equalization order was sent to the county auditor (before passage of Ch. 205 such notice was sent to the assessor). § 441.48, as amended by Ch. 205, § 3. The county could then protest the proposed adjustments at public hearing before the Department. Id.

The next steps were governed by § 441.-49, which was substantially rewritten by the legislature in 1975. Ch. 205, § 4.

Before enactment of Ch. 205, the Department was to formulate by the third Monday of October a final equalization order and send written notice thereof to the county assessor. After the first of the year but before April 16th the assessor, in accordance with the equalization order, adjusted property values as assessed the previous year. Taxpayers whose property values were affected by the equalization order had the right to object via the same procedure utilized in protesting assessments. §§ 441.-37, 441.38, 441.39. Results upon implementation of the order and any protests thereof were finally transmitted to the Department.

After enactment of Ch. 205, written notification of the final equalization order was sent to the county auditor rather than the assessor. The auditor was required to "notify by publication in official newspapers of general circulation any class or classes of property affected by an equalization order." § 441.49, as amended by Ch. 205, § 4. The auditor then added to or deducted from the affected valuations as required by the order.

The local board of review was to reconvene in special session for the month of November to hear protests of individual taxpayers filed by November 15th. The local board did not act upon such protests but rather made recommendations to the Department. Section 441.49 as amended no longer incorporated the statutory procedure for protesting assessments. Neither were such protests nor the auditor's ministerial adjustment duties delayed into the succeeding year.

This new procedure for implementation of the equalization order and provisions for protest thereof is the main target of the instantly precipitated constitutional attacks.

In the present case it appears the Linn County Assessor complied with the above stated assessment procedures and transmitted an abstract to the Department.

September 11, 1975, the Department sent the Linn County Auditor notification of the equalization order's issuance. Linn County voiced timely oral protests at an October 8th public hearing.

October 20th, the Department sent to the Linn County Auditor an issuance notification of the final equalization order. November 4th, notice thereof was published by the auditor in the Cedar Rapids Gazette.

November 1st, the Linn County Board of Review reconvened and heard about 300 protests. Only some of the intervenors filed protests and none received relief by the Department's final order.

Meanwhile, plaintiffs, Linn County and its auditor and assessor (Linn County), filed the aforesaid petition for declaratory judgment and temporary injunction, alleging Ch. 441 as amended by Ch. 205 violated due process clauses of the United States and Iowa Constitutions, and delegation clause of the Iowa Constitution, Art. III, § 1. That petition was later amended reflecting issuance of the final equalization order, with additional prayers for certiorari review and mandamus.

Four groups of intervenors also filed petitions, each making the same basic allegations of constitutional infirmity against the equalization process as those in Linn County's petition. Ralph H. Blackford, Louise Blackford, Curtis J. Hayes, Ralph N. Gordon, Joyce A. Gordon, Milo Machula and Bessie Machula, constitute one group of in-

tervenors. These parties, hereinafter collectively referred to as Blackford, are Linn County property-owner residents.

November 11th, the Department successfully moved for dismissal as to Linn County and the municipal intervenors for lack of standing and capacity to sue. Linn County gave timely notice of appeal from that dismissal. Blackford and other intervenors thereafter prosecuted the case to its conclusion on the merits.

June 10, 1976, trial court held Ch. 441 as amended by Ch. 205 was constitutional and entered judgment accordingly. Blackford timely appealed.

### # 2–58954: APPEAL BY LINN COUNTY ON STANDING

The first appeal in this case presents an issue as to whether a county or county officer acting in official status has capacity or standing to challenge constitutionality of our legislatively established property tax equalization procedure.

I. A similar problem was presented in *Warren County v. Judges of Fifth Jud. Dist.*, 243 N.W.2d 894, 897 (Iowa 1976), where a county and several resident taxpayers challenged constitutionality of legislation concerning appointment of full-time judicial magistrates. Focusing upon the standing issue this court said:

"Our cases have uniformly held a county lacks the ability to mount a constitutional attack upon state legislative enactments. *Brunner v. Floyd County*, 226 Iowa 583, 584–585, 284 N.W. 814, 815 (1939); *C. Hewitt & Sons Co. v. Keller*, 223 Iowa 1372, 1377, 275 N.W. 94, 97 (1937); *Scott County v. Johnson*, 209 Iowa 213, 221, 222 N.W. 378, 381 (1928). See 16 C.J.S. Constitutional Law § 76b, pp. 245–246. Because, as individuals and taxpayers, certain of the petitioners have sufficient standing, we can and do decline the request we reconsider the rule barring a county from such challenges."

Although the numerous intervenors would similarly justify abstention here, resolution of this recurring problem is now appropriate.

The leading Iowa case on this subject is *C. Hewitt & Sons Co. v. Keller*, 223 Iowa 1372, 275 N.W. 94 (1937), which involved an action for mandamus to compel a tax refund. Defendant county board of supervisors attempted to justify the auditor's failure to comply with a particular statute on the ground the law was unconstitutional. We determined, however, the supervisors had no authority to raise such a defense, and in so doing said, 223 Iowa at 1377, 275 N.W. at 97:

"Counties and other municipal corporations are, of course, the creatures of the Legislature; they exist by reason of statutes enacted within the power of the Legislature, and we see no sound basis upon which a ministerial (or, for that matter, any other) office may question the laws of its being. The creature is not greater than its creator, and may not question that power which brought it into existence and set the bounds of its capacities."

As an additional but narrower ground for that holding, this court quoted at length from *State v. Steele County Board of Com'rs*, 181 Minn. 427, 232 N.W. 737, 738 (1930), a relevant part thereof being now repeated:

"3. The question then here arises as to whether the respondents, public officials, who have no personal pecuniary interest one way or the other, may be permitted to question the constitutionality of a law to avoid the performance of a ministerial duty which it clearly imposes upon them. The performance of such duty does not affect the personal or property rights of these officials. They have no interest in defeating the purpose of the law. They can suffer no injury by carrying out the mandate of the statute. No violation of duty can be imputed to them by reason of their complying with the statute.

"* * *

"The authorities are in conflict. The better doctrine, supported by the weight of authority, is that an official so charged with the performance of a ministerial

duty will not be allowed to question the constitutionality of such a law. This rule is based largely upon governmental policy. It rests upon the theory that the court should accept as final the acts of the Legislature and discourage attacks upon them except where necessary to protect the private interests of the individual asserting invalidity and peculiarly and particularly affected thereby. Officials acting ministerially are not clothed with judicial authority. To permit them to refuse to perform their duty on the ground that the commanding law is unconstitutional would be a dangerous practice, in that they who have only ministerial duties would be raising questions affecting the rights of third persons while they themselves would have no direct interest in the question and could not in any event be made responsible."

Under either rationale the general rule enunciated in the more recent *Warren County* case prevails in Iowa and generally elsewhere. See, e. g., *Williams v. Mayor and City Council of Baltimore,* 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015 (1933); *City of Trenton v. State of New Jersey,* 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937 (1923); *City of Safety Harbor v. Birchfield,* 529 F.2d 1251, 1253–1256 (5th Cir. 1976); *City of New York v. Richardson,* 473 F.2d 923, 929 (2d Cir.), cert. denied sub nom. *Lavine v. Lindsay,* 412 U.S. 950, 93 S.Ct. 3012, 37 L.Ed.2d 1002 (1973); *El Paso County Water Im. Dist. No. 1 v. City of El Paso,* 133 F.Supp. 894, 906 (W.D.Tex.1955); *Baltimore County v. Churchill, Ltd.,* 271 Md. 1, 313 A.2d 829, 832–834, appeal dismissed, 417 U.S. 902, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974); *City of Marshall v. Public Emp. Ret. Ass'n,* Minn., 246 N.W.2d 572, 574–575 (1976); *Jeter v. Ellenville Central School Dist.,* 41 N.Y.2d 283, 392 N.Y.S.2d 403, 405–406, 360 N.E.2d 1086, 1088 (1977); *Appeal of Martin,* 286 N.C. 66, 209 S.E.2d 766, 771–773 (1974); *State v. Erickson,* 6 Ohio St.2d 130, 216 N.E.2d 371, 373–374 (1966); *Buse v. Smith,* 74 Wis.2d 550, 247 N.W.2d 141, 147 (1976); 16 C.J.S. Constitutional Law §§ 76b, 82 and 300 et seq.; 16 Am. Jur.2d, Constitutional Law, § 128. But see

*People v. Johnson,* 26 Ill.2d 268, 186 N.E.2d 346, 347 (1962).

Various exceptions to this precept have emerged and gained some acceptance in other jurisdictions. See generally Annots., 30 A.L.R. 378, 129 A.L.R. 941.

For example, where the subject matter of the challenged statute is of particularly major public importance, ministerial officers have been allowed to challenge such legislation. E. g., *Kaulakis v. Boyd,* 138 So.2d 505, 507 (Fla.1962); *Associated Hospital Service of Maine v. Mahoney,* 161 Me. 391, 213 A.2d 712, 717 (1965); *Baltimore County v. Churchill, Ltd.,* 313 A.2d at 833 & nn.3 & 4; *Loew v. Hagerle Bros.,* 226 Minn. 485, 33 N.W.2d 598, 600–601 & n.1 (1948); *Department of State Highways v. Baker,* 69 N.D. 702, 290 N.W. 257, 260–262 (1940); *Yelle v. Bishop,* 55 Wash.2d 286, 347 P.2d 1081, 1088 (1959); *Fulton Foundation v. Wisconsin Dept. of Taxation,* 13 Wis.2d 1, 108 N.W.2d 312, 317–318, modified, 109 N.W.2d 285 (1961); cf. *Steele County,* 232 N.W. at 738.

Additionally, some courts would grant suit authority to a public officer whose duty it is to examine legislation or the purpose thereof in connection with his regular duties. *Elwell v. County of Hennepin,* 301 Minn. 63, 221 N.W.2d 538, 543 (1974); *Fulton Foundation,* 108 N.W.2d at 317 & n.1. Similarly, where an official would be personally liable for implementing a statute later held invalid, such a personal stake in its constitutionality may suffice. *Mahoney,* 213 A.2d at 717; *Fulton Foundation,* 108 N.W.2d at 317 & n.1; 16 Am.Jur.2d, Constitutional Law, § 128 at 326 & n.1.

■ Noticeably, most of the above cited illustrative cases involved disbursement or control of public funds. See, e. g., *Kaulakis,* 138 So.2d at 507; *Loew,* 33 N.W.2d at 601. In contrast, the present case relates to procedure for intercounty equalization of property tax valuations, a matter of public concern but not of such moment as to justify an exception to establish suit capacity requirements. Cf. *Appeal of Martin,* 209 S.E.2d at 772. But see *Fulton Foundation,* 109 N.W.2d at 285–286.

Moreover, relevant duties of the Linn County Auditor were purely ministerial in nature: implementation of valuation adjustments made by the Department and notification to affected taxpayers. See *Independent Sch. Dist. v. Christiansen,* 242 Iowa 963, 969–971, 49 N.W.2d 263, 267 (1951), and citations. In other words, the auditor was vested with no relevant discretion whatsoever and had no duty to interpret legislation. Compare *Baltimore County v. Churchill, Ltd.,* 313 A.2d at 834. Nor is there any plausible basis on which the auditor or assessor could incur personal liability by complying with the new procedure if it were later determined to be unconstitutional.

Because neither of the two above noted exceptions is presently helpful to plaintiffs, it is unnecessary to decide whether such exceptions should now be adopted.

A third exception relied on by plaintiffs is articulated in *Van Horn v. State,* 46 Neb. 62, 64 N.W. 365, 371–372 (1895). But this exclusion stands explained and dispositively rejected in Minnesota's *Steele County* case:

> "[I]t is suggested that the official charged with such ministerial duty may raise the question because his oath of office compels him to support the Constitution. The answer to that course of reasoning is that his oath does not require him to obey the Constitution as he decides, but as judicially determined." 232 N.W. at 738, quoted in *Keller,* 223 Iowa at 1376, 275 N.W. at 96.

The Minnesota court's response is persuasive.

II. Finally, there appears no basis upon which to hold plaintiffs can satisfy the traditional tests of constitutional standing. Stated otherwise, no original plaintiff alleges a sufficient personal interest or stake in the outcome of the controversy to insure the dispute is presented in a concrete, adversarial context. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678 (1962); *Iowa Civil Liberties Union v. Critelli,* 244 N.W.2d 564, 567 (Iowa 1976).

Clearly, interests allegedly infringed by the challenged legislation are those of individual taxpayers and property owners. And where, as here, those persons are in a position to raise the constitutional questions themselves the narrowly defined *jus tertii* exceptions to the above stated general standing rule are not ordinarily available. See, e. g., *Eisenstadt v. Baird,* 405 U.S. 438, 443–447, 92 S.Ct. 1029, 1033–1035, 31 L.Ed.2d 349 (1972); *Iowa Movers & Warehousemen's Ass'n v. Briggs,* 237 N.W.2d 759, 772–773 (Iowa 1976). Accord, *Appeal of Martin,* 209 S.E.2d at 773. Compare *Fulton Foundation,* 109 N.W.2d at 286.

III. In summary, the general rule first articulated in *Keller* and other like cases is viable in modern day constitutional law: A county and its ministerial officers ordinarily have no right, power, authority, or standing to question the constitutionality of a state statute. We see no reason to here alter or abandon such a commonly accepted premise. Nor are plaintiffs aided by any of the exceptions thereto commonly recognized by other courts. Manifestly, the real parties in interest are fully capable of asserting the constitutional challenges presently raised. There is no need to accord plaintiffs any right or privilege to proceed in their stead.

Trial court's pretrial order dismissing the action as to original plaintiffs was entirely proper and must stand.

### # 2–59663: APPEAL BY BLACKFORD ON THE MERITS

The second appeal raises numerous constitutional questions, all decided below adversely to Blackford. For purpose of discussion, they will be regrouped and restated:

I. Does "retroactive application" of Ch. 205 to the equalization of 1975 assessed property values violate due process?

II. Is the procedure for protesting effects of the equalization order on individual taxpayers' assessed property values constitutionally adequate?

A. Is a procedure for individual protests of the equalization order constitutionally necessary?

1. Does *procedural* due process apply to intercounty adjustment and equalization by the State of property assessments?

2. Does § 441.49 as amended unduly delegate legislative authority in violation of Art. III, § 1 of the Iowa Constitution?

B. If necessary, is the procedure for individual protests constitutionally adequate?

1. Does the notification procedure of § 441.49 as amended comply with due process?

 a. As to method?

 b. As to content?

 c. As to timeliness?

2. Do the provisions for protest to the local board of review comply with due process requirements?

 a. Is hearing before the Department constitutionally necessary?

 b. Does § 441.49 as amended provide sufficient standards or guidelines for evaluating protests?

 c. Does absence of provision for judicial review of the decision of the local board of review and the Department violate due process?

 d. Does the failure to provide for review of adjustments in assessed property values similar to that available to taxpayers protesting the assessments themselves violate equal protection?

Not all of these issues need be reached or resolved.

I. At the outset there is no issue before us regarding Blackford's status as intervenor or his ability or standing to pursue a resolution on the merits of this dispute either below or on appeal. In fact, Blackford's status is the same as an original party plaintiff, unaffected by Linn County's lack of standing. *Kintzel v. Wheatland Mutual Insurance Ass'n,* 203 N.W.2d 799, 806 (Iowa 1973); *Schimerowski v. Iowa Beef Packers, Inc.,* 196 N.W.2d 551, 555 (Iowa 1972); *State ex rel. Turner v. Iowa State Highway Com'n,* 186 N.W.2d 141, 147–148 (Iowa 1971); Iowa R.Civ.P. 75; 59 Am.Jur.2d, Parties, § 177.

II. Also, for purpose of our de novo review, it is further noted Blackford assumes a heavy burden in challenging the constitutionality of the involved statutory procedures. The legislature may devise any procedure desired provided it is not clearly repugnant to constitutional provisions; wisdom or desirability of the design selected are of no concern to the courts. Furthermore, statutes are presumed constitutional and Blackford must negate every reasonable basis on which the statute can be sustained. Finally, courts will not interfere when constitutionality is only doubtful or debatable. *Graham v. Worthington,* 259 Iowa 845, 850–851, 146 N.W.2d 626, 630–631 (1966). See also *Chicago Title Ins. Co. v. Huff,* 256 N.W.2d 17, 23–25 (Iowa 1977); *Avery v. Peterson,* 243 N.W.2d 630, 633 (Iowa 1976); *Grant v. Fritz,* 201 N.W.2d 188, 193 (Iowa 1972).

III. Proceeding to the merits, we first entertain Blackford's argument that utilization of the Ch. 205 notification and protest provisions in adjusting 1975 assessments constitutes retroactive application of the 1975 legislation, an alleged violation of the due process clause, Fourteenth Amendment to the United States Constitution.

Blackford contends he had a vested interest in the value of his property as originally fixed by the county assessor. He attendantly posits such assessed value was final and could not be constitutionally changed by an equalization order emanating from § 441.49 as amended.

Blackford's argument is patently without merit and reflects a basic misunderstanding of the assessment and equalization system which pervades intervenors' entire action and appeal.

As explained earlier, the assessment of individual property values for 1975 was accomplished in the spring and summer of that year. After all assessed valuation protests had been resolved by the local board of review, the county assessor transmitted an abstract thereof to the Department.

Subsequently, equalization of assessed values was performed by the Department. Significantly, the distinction between as-

sessment and equalization is crucial and well established:

"Assessment is the act of placing a value for tax purposes upon the property of a particular taxpayer. Equalization, on the other hand, is the act of raising or lowering the total valuation placed upon a class, or subclass, of property in the aggregate. Equalization deals with all the property of a class or subclass within a designated territorial limit, such as a county, without regard to who owns the individual parcels making up the class or subclass. Assessment relates to individual properties; equalization relates to classes of property collectively." *Lamm v. Barber,* Colo., 565 P.2d 538, 545 (1977).

See also *Union Pac. R. Co. v. Board of Commissioners,* 35 F.2d 785, 790 (10th Cir. 1929), cert. denied, 281 U.S. 734, 50 S.Ct. 249, 74 L.Ed. 1149 (1930); *People v. Texas Co.,* 406 Ill. 120, 92 N.E.2d 142 (1950); *Allied Supermarkets, Inc. v. City of Detroit,* 391 Mich. 460, 216 N.W.2d 755, 758 (1974); *Rollman & Sons Co. v. Board of Revision,* 163 Ohio St. 363, 127 N.E.2d 1, 5–6 (1955); 72 Am.Jur.2d, State and Local Taxation, § 831 at 139; 84 C.J.S. Taxation §§ 489 and 497.

Iowa authorities are in accord therewith. E. g., *Avery v. Peterson,* 243 N.W.2d at 632; *Appanoose Co. R. Tax. Assoc. v. Iowa State Tax Com'n,* 158 N.W.2d 176, 180 (Iowa 1968); *Hougen v. George,* 254 Iowa 1055, 1058–1059, 120 N.W.2d 497, 498–499 (1963); *Read v. Hamilton County,* 231 Iowa 1255, 1264, 3 N.W.2d 597, 601 (1942); *Home Owners L. Corp. v. Polk County,* 231 Iowa 661, 664–665, 1 N.W.2d 742, 743–744 (1942); *Pierce v. Green,* 229 Iowa 22, 51–52, 294 N.W. 237, 254–255 (1940); *State v. Local Board,* 225 Iowa 855, 283 N.W. 87 (1938); *Des Moines Gas Co. v. Saverude,* 190 Iowa 165, 170, 180 N.W. 193, 195 (1920).

Again, as heretofore explained, the Department transmits its equalization order to the county auditor, who then adjusts assessments upward or downward as required by the directive.

■ In this regard, Blackford bases his argument on the last sentence of § 441.28,

which states: "No changes shall be made on the assessment rolls after April 16 except by order of the board of review or by decree of court." However, this merely serves as a deadline for the assessment process, performed by the assessor. It does not restrict the wholly separate and necessary process of equalization performed by the Department and effectuated by the auditor. As this court said in *Pierce v. Green,* 229 Iowa at 52, 294 N.W. at 255: "The fact that taxing bodies may have acted does not prevent the commission from taking such steps as may be necessary to equalize the tax burden." The position here taken by Blackford under similar statutory systems has been expressly rejected by at least four other courts. See *State v. Rella Verde Apartments, Inc.,* 25 Ariz.App. 458, 544 P.2d 675, 680–681 (1976); *Dressler v. County of Alpine,* 64 Cal.App.3d 557, 134 Cal.Rptr. 554, 557 (1976); *People v. Hively,* 139 Colo. 49, 336 P.2d 721, 726 (1959); *Hansen v. County of Lincoln,* 188 Neb. 461, 197 N.W.2d 651, 653–654 (1972).

■ Moreover, any other conclusion could result in unconstitutional, discriminatory treatment of individual taxpayers because it would prevent any equalization of differing assessment rates. In this vein, *Pierce v. Green,* 229 Iowa at 28–29, 294 N.W. at 243, takes note of the fact that differing tax-related valuations are as constitutionally repulsive as dissimilar rates. See also *Hanselman v. Humboldt County,* 173 N.W.2d 75, 78 (Iowa 1969); *Chicago and North Western Railway Co. v. Prentis,* 161 N.W.2d 84, 87 (Iowa 1968); *Allied Supermarkets, Inc. v. City of Detroit,* 216 N.W.2d at 758. Therefore, it is the State's *duty* to provide for equalization. *Appanoose County,* 158 N.W.2d at 180; *Saverude,* 190 Iowa at 170, 180 N.W. at 195.

■ Clearly, Blackford's interpretation of § 441.28 would prevent the Department from fulfilling its obligation. The fact that adjustments made in assessed value occurred in 1975 rather than 1976 (as was the case before enactment of Ch. 205) is immaterial. Under either statutory schedule the

property assessments made in 1975 would have been adjusted pursuant to an equalization order before eventual taxation in 1976. Ch. 205 served only to speed up the equalization process; it did not alter *content* of the order issued.

Blackford's first assignment was properly rejected by trial court.

IV. The main focus of Blackford's remaining constitutional challenges goes to sufficiency of provisions for individual protests of the equalization order as tested by traditional due process and equal protection standards and the delegation of legislative authority clause of the Iowa Constitution, Art. III, § 1.

First questioned is adequacy of the notice provisions of § 441.49 as amended. More specifically, Blackford maintains: (1) notice by publication is inadequate, (2) the auditor is not required to inform taxpayers of their right to a hearing before the local board of review, and (3) the procedure does not afford taxpayers sufficient time to prepare their protests.

Second, Blackford claims the hearing provided before the local board of review does not comport with due process requirement of a reasonable opportunity to be heard. Consecutively, he argues: (1) hearing should instead be before the Department, which makes the final decision on such protests, (2) no standards are provided for judging the merits of the protests, and (3) absence of provisions for judicial review of decisions on protests violates due process. Relatedly, he submits failure to provide a protest and review process equivalent to that utilized in the assessment procedure is a violation of equal protection.

Much of the foregoing is obviated by answer to a preliminary question: Is notice and an opportunity to be heard a constitutional prerequisite to application of the equalization order to assessed property values? Our answer is no.

The landmark case on this subject is *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915). There, as in the present situation, a taxpayer sought to enjoin implementation of a citywide equalization order which raised the assessed valuation of his property. In rejecting his claims of a due process-based right to an opportunity to be heard on the valuation increase, the Supreme Court said:

"The question, then, is whether all individuals have a constitutional right to be heard before a matter can be decided in which all are equally concerned,—here, for instance, before a superior board decides that the local taxing officers have adopted a system of under-valuation throughout a county, as notoriously often has been the case. The answer of this court in the *State R. Tax Cases*, 92 U.S. 575, 23 L.Ed. 663, at least, as to any further notice, was that it was hard to believe that the proposition was seriously made.

"Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule. * * * There must be a limit to individual argument in such matters if government is to go on."

Resolving a similar situation in *State Railroad Tax Cases*, 92 U.S. 575, 23 L.Ed. 663, 672 (1876), the Court was even more specific:

"It is charged that the Board of Equalization increased the estimates of value so reported to the auditor, without notice to the Companies, and without sufficient evidence that it ought to be done; and it is strenuously urged upon us that, for want of this notice, the whole assessment of the property and levy of taxes is void.

"It is hard to believe that such a proposition can be seriously made. * * * The main function of this Board is to equalize these assessments over the whole State. If they find that a county has had its property assessed too high in reference to the general standard, they may reduce its valuation; if it has been fixed too low, they raise it to that standard. When they raise it in any county, they necessarily raise it on the property of every individual who owns any in that county. Must each one of these have notice and a separate hearing? If a railroad company is by law entitled to such notice, surely every individual is equally entitled to it. Yet if this be so, the expense of giving notice, the delay of hearing each individual, would render the exercise of the main function of this Board impossible. The very moment you come to apply to the individual the right claimed by the Corporation in this case, its absurdity is apparent."

The rule in *Bi-Metallic Investment* and *Railroad Tax Cases* unquestionably remains a valid interpretation of the due process clause of the Fourteenth Amendment. See, e. g., *United States v. Florida East Coast Railway Company,* 410 U.S. 224, 245, 93 S.Ct. 810, 821, 35 L.Ed.2d 223 (1973). In the specific context of property tax equalization, *Bi-Metallic* and *Railroad Tax Cases* remain adversely dispositive of much asserted by Blackford. *State v. Rella Verde Apartments, Inc.,* 544 P.2d at 680–681; *Dressler v. County of Alpine,* 134 Cal.Rptr. at 556–557; *Lamm v. Barber,* 565 P.2d at 546–550; *Griggs v. Greene,* 230 Ga. 257, 197 S.E.2d 116, 123–124 (1973); *Dietman v. Hunter,* 5 Ill.2d 486, 126 N.E.2d 22 (1955); *State ex rel. Miller v. Dwyer,* 208 Kan. 437, 493 P.2d 1095, 1098–1100 (1972); *In re Valuation & Equal. of Urban & Rural Real Est.,* 180 Neb. 497, 143 N.W.2d 885 (1966); *Beveridge v. Baer,* 59 S.D. 563, 241 N.W. 727, 729–730 (1932); *Southern Railway Company v. Clement,* 57 Tenn.App. 54, 415 S.W.2d 146 (1966); Annots., 84 A.L.R. 197 and 24 A.L.R. 331; 72 Am.Jur.2d, State and Local Taxation, § 821; 84 C.J.S. Taxation §§ 503b, c and 504.

Stated otherwise, due process does not require avenues for protest at every stage of the taxation process. *Dressler,* 134 Cal.Rptr. at 557; *Dietman,* 126 N.E.2d at 23. Blackford and his kindred taxpayers were provided full opportunity to protest the assessments. § 441.23 et seq. Those provisions need not, as a matter of due process, be made available again when assessments are adjusted on a statewide basis.

Similarly, the equalization procedure as it existed after passage of Ch. 205 does not constitute a delegation of legislative authority proscribed by Art. III, § 1 of the Iowa Constitution. In this regard, Blackford does not contest the delegation itself of the equalization duty to the Department. Rather, he maintains only that such delegation was not accompanied by adequate procedural safeguards.

In this regard, Iowa has experienced a gradual trend toward greater liberality in approving delegations of legislative authority. See *Grant v. Fritz,* 201 N.W.2d at 192; Note, 58 Iowa L.Rev. 974 (1973). Resultantly, we no longer examine legislation for precise substantive guidelines or standards; emphasis is now on existence of adequate procedural safeguards. More specifically, where sufficient *procedural* safeguards are provided by legislation which also defines general policy, absence of precise *substantive* guidelines or standards will not alone be invalidating. *Cedar Rapids, etc. v. Cedar Rapids Commun. Sch.,* 222 N.W.2d 391, 399–400 (Iowa 1974); *State ex rel. Iowa Air P. Con. Com. v. City of Winterset,* 219 N.W.2d 549, 552 (Iowa 1974); *Grant v. Fritz,* 201 N.W.2d at 192–193; *Iron Workers Local No. 67 v. Hart,* 191 N.W.2d 758, 772–773 (Iowa 1971); *Elk Run Telephone Co. v. General Telephone Co.,* 160 N.W.2d 311, 315–316 (Iowa 1968).

Mindful of the fact Blackford does not claim an absence of substantive guidelines or legislative policy statements, we need only determine whether sufficient procedural safeguards are presently provided. Whether such protections accompany the

instantly involved legislative delegation, however, depends at the outset on purpose of the delegation; i. e., what function the agency will serve on behalf of the general assembly.

At this point, *Bi-Metallic* and its due process rationale, quoted earlier, again come into play. Justice Holmes' opinion has today assumed major importance in administrative law as foundation for the differing treatment given legislative functions as opposed to adjudicative or quasi-judicial responsibilities. See, e. g., *United States v. Florida East Coast Railway Company,* 410 U.S. at 244–245, 93 S.Ct. at 820–821; *Uphaus v. Wyman,* 360 U.S. 72, 101 n.8, 79 S.Ct. 1040, 1057, 3 L.Ed.2d 1090 (1959) (Brennan, J. dissenting); *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 167, 71 S.Ct. 624, 646, 95 L.Ed. 817 (1951) (Frankfurter, J. concurring); *Bowles v. Willingham,* 321 U.S. 503, 519–520, 64 S.Ct. 641, 649–650, 88 L.Ed. 892 (1944); *Alaska Airlines, Inc. v. C.A.B.,* 178 U.S.App. D.C. 116, 122, 545 F.2d 194, 200 (1976); *Pickus v. United States Bd. of Parole,* 177 U.S.App.D.C. 93, 97, 543 F.2d 240, 244 (1976); *Thompson v. Washington,* 162 U.S. App.D.C. 39, 51–52, 497 F.2d 626, 638–639 & nn.42 & 43 (1973); *Willapoint Oysters v. Ewing,* 174 F.2d 676, 694 & n.38 (9th Cir.), cert. denied, 338 U.S. 860, 70 S.Ct. 101, 94 L.Ed. 527 (1949); *Powelton Civic Home Own. Ass'n v. Department of H. & U. Dev.,* 284 F.Supp. 809, 829 (E.D.Pa.1968); *San Diego Bldg. Contr. Ass'n v. City Coun. of San Diego,* 13 Cal.3d 205, 118 Cal.Rptr. 146, 149, 529 P.2d 570, 573 (1974); *Shoenberg Farms, Inc. v. People ex rel. Swisher,* 166 Colo. 199, 444 P.2d 277, 282–283 (1968); *Cambridge Elec. Light Co. v. Department of Pub. Util.,* 363 Mass. 474, 295 N.E.2d 876, 885 (1973); *Sherwin v. Mackie,* 364 Mich. 188, 111 N.W.2d 56, 61–62 (1961); *Hylen v. Owens,* Minn., 251 N.W.2d 858, 861 (1977); *Cunningham v. Department of Civil Service,* 69 N.J. 13, 350 A.2d 58, 61–62 (1975); *Allison v. Washington County,* 24 Or.App. 571, 548 P.2d 188, 191 & n.5 (1976); *Senior Citizens League v. Department of Social Sec.,* 38 Wash.2d 142, 228 P.2d 478, 492–493 (1951); *Bonfield, Formal Agency Adjudication,* 63 Iowa L.Rev. 285, 323–325 (1977).

 Briefly stated, when a governmental agency exercises a *legislative* function, due process does not require public participation by hearing or otherwise. A fortiori, notice prior to governmental action is likewise constitutionally unnecessary.

Therefore, the equalization procedure must be studied to determine whether it represents a legislative or adjudicative function. This dichotomous characterization of agency operations is a well established concept in the field of modern administrative law.

 Generally, a governmental agency functions legislatively when it promulgates policies, standards, regulations, or rules of general application and prospective operation. The agency's decision is appropriately based on considerations similar to those which the legislature itself could have invoked, not the evidentiary input of particular individuals describing specific situations or instances. Conversely, a governmental agency serves in an adjudicatory capacity when it determines the rights, duties and obligations of specific individuals as created by past transactions or occurrences. *Florida East Coast Railway,* 410 U.S. at 244–245, 93 S.Ct. at 820–821; *Bowles v. Willingham,* 321 U.S. at 519, 64 S.Ct. at 649; *McGrath,* 341 U.S. at 167, 71 S.Ct. at 646; *Thompson v. Washington,* 497 F.2d at 638–639 & n.42; *In re Lone Tree Community School District,* 260 Iowa 719, 722–723, 150 N.W.2d 637, 639 (1967); 1 Am. Jur.2d, Administrative Law, §§ 93, 138.

 In some circumstances, analysis of the nature of agency action may prove difficult. E. g., *Florida East Coast Railway,* 410 U.S. at 245, 93 S.Ct. at 821; *Cunningham,* 350 A.2d at 61–62. In the present case, however, we are aided by the heavy use to which *Bi-Metallic* has been put as an example of a legislative function. As noted earlier, *Bi-Metallic* involved challenges to an equalization procedure similar to those raised by Blackford. In both of these instances the equalization order represented an agency promulgation of general applica-

tion: It uniformly raised every like-property assessment in the involved assessment district. As explained earlier, such order operates prospectively as to current and subsequent tax years. Moreover, the Department here did only what the legislature could have done itself but chose not to do for practical reasons.

Most importantly, an individual taxpayer can make no significant contribution to the *equalization* process by reiterating evidence to the effect his or her *assessment* was incorrect. The considerations on which the equalization order is based are county by county comparisons, not the relative merits of specific assessments.

Flowing therefrom is the inescapable conclusion that the Department functioned *legislatively* when it attempted to equalize assessed property values on a statewide basis. Ergo, the procedural safeguards provided by § 441.49 as amended were not constitutionally necessary in order to validate the delegation of legislative authority.

This does not mean those guidelines are unnecessary from a *statutory* point of view. Whether the procedure followed complies with the Iowa Administrative Procedure Act, Ch. 17A, The Code, is not, however, an issue raised by this appeal. Neither do we find it necessary to examine adequacy of the substantive guidelines used in determining equalization rates.

Having determined procedural safeguards need not, as a matter of due process or the delegation clause accompany the equalization procedure employed by the Department there is no need to examine adequacy of the notice and hearing directives electively supplied by the legislature. By the same token, Blackford's equal protection argument is negated.

Remaining is Blackford's attack upon the absence of provision for judicial review of the Department's action. Cf. *Bowles v. Willingham,* 321 U.S. at 520, 64 S.Ct. at 650. Noticeably, however, such review of the present legislatively delegated agency action was available at all times here concerned under the provisions of Code § 17A.19, effective July 1, 1975 (Administrative Procedure Act).

Trial court did not err in holding Blackford's attack upon the constitutionality of § 441.49 as amended was without merit.

## CONCLUSION

All contentions necessary for determination of these appeals, whether or not discussed above, have been considered and found to be devoid of substance.

Costs on first appeal (2–58954) are taxed to Linn County. Costs on second appeal (2–59663) are taxed in equal part to the several appealing intervenors, above collectively identified as Blackford.

AFFIRMED ON BOTH APPEALS.

All Justices concur except REYNOLDSON, J., who dissents.